In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3325

Kenneth M. Shanoff,

Plaintiff-Appellant,

v.

State of Illinois Department of Human Services,


Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4084--James F. Holderman, Judge.

Argued April 4, 2001--Decided July 25, 2001


   Before Coffey, Manion, and Diane P. Wood,
Circuit Judges.

   Manion, Circuit Judge.  Kenneth Shanoff
sued his employer, the Illinois
Department of Human Services ("IDHS"),
alleging that his supervisor subjected
him to a hostile work environment because
of his race and religion, in violation of
Title VII. The IDHS moved for summary
judgment, which the district court
granted, concluding that the supervisor's
remarks were not severe enough to create
a hostile work environment. Shanoff
appeals. We reverse and remand.

I.

   Kenneth Shanoff graduated from the
Chicago Medical School in the 1970's, but
he is not licensed to practice medicine.
He began working for the IDHS in 1995 as
a staff development and training
coordinator at the John Madden Mental
Health Center ("Madden Center"). In July
1996, Sylvia Riperton-Lewis ("Riperton-
Lewis"), who is black, was hired as a
manager at the Madden Center and became
Shanoff's direct supervisor.
   Shanoff, who is white and Jewish,
alleges that over the next several
months, Riperton-Lewis repeatedly
harassed him with remarks directed at his
race and religion. Riperton-Lewis denies
that she made any of the discriminatory

comments that Shanoff has alleged in this case. But "[b]ecause the district court granted summary judgment in favor of the defendant, we take the facts alleged by the plaintiff to be true." Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998).

In the summer of 1996, Shanoff met with Riperton-Lewis to discuss work matters, and during that meeting she asked Shanoff his religion. When Shanoff suggested that the question was "strange," Riperton-Lewis responded that she had a "right" to ask it. Shanoff responded that he is Jewish. During another meeting in the fall of 1996 or the winter of 1997, Riperton-Lewis referred to Shanoff as a "haughty Jew." When Shanoff told Riperton-Lewis that her comment made him angry, she told him that he did not want to see "this nigger get angry," and then she lunged at him with a pen, which Shanoff evaded. Shanoff reported this incident to Ugo Formigoni, M.D., the director of the Madden Center and Riperton-Lewis's supervisor. Shanoff also asked Formigoni for a change in supervisors. According to Shanoff, Formigoni stated that the incident was "terrible" and that he would look into it, but he did not change Shanoff's supervisor.

From January through March 1997, Riperton-Lewis turned down requests by Madden Center staff for Shanoff to conduct presentations, and she attempted to terminate Shanoff's involvement with medical students. Shanoff asked Riperton-Lewis why she did not want him to teach medical students, which was provided for in his job description. She responded by taking Shanoff's job description out of her desk, scratching out that provision, and stating, "Now it's not." When Shanoff asked her why she did that, Riperton-Lewis replied: "I know how to put you Jews in your place."

In March or April 1997, Shanoff reported these incidents to Sue Varso, the Director of Labor Relations at the Madden Center. He asked for a change of supervisor and for Riperton-Lewis's comments to cease. Varso advised him that he could file a complaint with the Equal Employment Opportunity Commission ("EEOC"). According to Shanoff, while he was considering whether to file a

complaint, "Riperton-Lewis called me into her office and told me that if I did such a thing, if I did report her to anyone outside of the facility, that she had friends who could take care of me and who would take care of me." Shanoff considered those remarks a "direct threat." He felt trapped and did not report the incident to anyone.

Riperton-Lewis and Shanoff continued to disagree about whether he should be teaching certain courses. In early September 1997, Riperton-Lewis came into Shanoff's office and "told [him] that she was tired of [him] not knowing [his] place, and that when was [he] going to learn that she knew how to handle white Jewish males like [him]." When Shanoff asked her to leave his office, she repeatedly replied "you know damn well I know how to handle white Jewish males like you and when are you going to learn." During that same month, Shanoff had requested personal days off for Rosh Hashanah and Yom Kippur. But Riperton-Lewis denied his request, stating, "I don't give a damn about your holidays."

In November 1997, Riperton-Lewis had ordered Shanoff to no longer participate in a particular project at the Madden Center that Shanoff had co-chaired with Joel Silberberg, M.D., the Center's medical director. In response to a question from Silberberg, Shanoff notified him of Riperton-Lewis's order and, according to Shanoff, Silberberg apparently discussed the situation with Riperton-Lewis. Riperton-Lewis then called Shanoff into her office and ordered him not to "speak to anyone in leadership about any matter without her permission . . . or there would be trouble." Shanoff had also testified that Riperton-Lewis then "went into a rage" and told him that he "didn't want to see or wasn't [he] tired of seeing what an angry nigger could do." According to Shanoff, Riperton-Lewis stated that she "would see to it that she would ruin my career, and that she was protected and could do as she pleased." That ended the conversation.

That same month, Shanoff discussed this incident with Ms. Lee Steiner, a director at the Madden Center. Shanoff testified that he told Steiner that he "felt totally trapped and that [he] couldn't

tolerate the situation anymore and [he] needed her [Steiner's] help." Shanoff also discussed the incident with Formigoni in November 1997. According to Shanoff:

[Formigoni] said that it was obvious that there was going to be no resolution to this and that I needed to think about looking for other places to work, that there was no way he was going to change supervisors and that I needed to look for a different place to work if I wanted to be happy, that it was not his job to make me happy and that I needed to look for another place of employment.

During the same month, Shanoff also discussed Riperton-Lewis's remarks with Pat Madden, the hospital administrator at the Madden Center. Shanoff testified that:

[Pat Madden] said well she could appreciate the problems I was having, that Dr. Formigoni was Ms. Riperton-Lewis' supervisor, therefore, she could do nothing and she gave me three options. One, that I would learn to live with it, live with the comments and the behaviors; two would be to find a different place of employment; or three to sue Ms. Riperton-Lewis.

Shanoff responded that he "felt totally trapped in the situation" and "that [he] couldn't tolerate--that no one could tolerate the continual discriminatory actions and behaviors of a supervisor, and that suing was not an option because [he] had already been threatened by Ms. Riperton-Lewis."

   Shanoff also claims that one day in October or November 1997, when he left for the day, he forgot to "swipe out" with a card as required by Madden Center employees. Riperton-Lewis responded by reporting that day for Shanoff as an unauthorized absence ("UA") and docking half of that day's pay. Shanoff then marshaled documentation that he worked that day and he requested Riperton-Lewis to delete the UA from his record. But she denied his request, responding that she was "tired of dealing with Jews like you."

   In late December 1997, Shanoff again met with Formigoni to tell him that his

health was failing because of Riperton-Lewis's discriminatory comments, actions and threats. Shanoff also states that a day or two later, Riperton-Lewis "told me that I must be pretty stupid because I would never learn that she was protected, that Howard Peters [who is black] would protect her, that he [Peters] was one of them and that she would see to it that my white ass--my white Jewish ass would be kept down." Shanoff replied to Riperton-Lewis that his health was failing, and according to Shanoff, "she looked at me and said, good."

In January 1998, Riperton-Lewis again said to Shanoff that she no longer wanted him to teach medical students. According to Shanoff, she also affirmed that she "was going to be able to keep my white Jewish ass down."

Again, in late February or early March 1998, Riperton-Lewis told Shanoff that "she knew how to handle white Jewish males, and once and for all that [he] needed to leave Madden and get out of her hair." According to Shanoff, he then told her that "what she had done to me had made me sick, that I was becoming a nothing;" to which she replied by laughing and dismissing him from her office.

On March 16, 1998, Shanoff voluntarily took an extended sick leave, using his accumulated sick leave time. He has extended that leave into a medical/disability leave because he is suffering from depression, and he continues to be on a medical leave of absence from the Madden Center.

In October 1998, while Shanoff had been on leave for several months, Riperton-Lewis called him at home and told him: "you either appear before me tomorrow, or I will take steps to have you discharged." Shanoff responded that his physician had already informed her that he is not able to appear at work. Shanoff then asked her "why are you being like this," to which she responded, "I hate everything that you are."

On October 13, 1998, Shanoff filed a charge with the Illinois Department of Human Rights and the EEOC, alleging that his supervisor discriminated against him on the basis of his "race (Caucasian)"

and "religion, Jewish." After receiving his right to sue letter, Shanoff sued the IDHS in federal court, alleging that he was discriminated against on the basis of his race and religion in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. sec. 2000e et seq. The IDHS moved for summary judgment, arguing that Shanoff's claim should fail because he suffered no adverse action, and that all of his claimed instances of discrimination that occurred before December 18, 1997 (300 days before Shanoff filed his charge with the EEOC) were barred as untimely. The district court construed Shanoff's allegations as a hostile environment claim, determined that the incidents of harassment that occurred before December 18, 1997 were barred by Title VII's 300-day statute of limitations, and granted the IDHS's summary judgment motion, concluding that the incidents of harassment that occurred within the limitations period were not severe or pervasive enough to create a hostile environment. Shanoff appeals.

II.

Shanoff argues that the district court erred in granting summary judgment for the IDHS on his hostile environment claim. We review de novo the district court's decision to grant summary judgment. McPhaul v. Board of Comm'rs of Madison County, 226 F.3d 558, 563 (7th Cir. 2000). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To survive summary judgment, the nonmovant must set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" Oest v. Illinois Dep't of Corrections, 240 F.3d 605, 610 (7th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). The statute also prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). In Illinois, an individual must initiate his hostile environment claim by filing an EEOC charge within 300 days of the alleged harassment. Speer v. Rand McNally & Co., 123 F.3d 658, 662 (7th Cir. 1997); 42 U.S.C. sec. 2000e-5(e). Shanoff filed his charge on October 13, 1998, so under the general rule, the conduct that occurred before December 18, 1997 (300 days prior to the filing of the charge) would be time-barred. Id. But Shanoff advances two legal theories to overcome the statute of limitations. He claims: (1) that because Riperton-Lewis threatened to harm him if he filed a claim, the IDHS should be equitably estopped from asserting the statute of limitations; and (2) that the harassing conduct constituted a continuing violation that continued to occur within the limitations period, and thus none of the conduct is time-barred.

   Shanoff first argues that because Riperton-Lewis of the IDHS threatened to harm him if he filed a complaint with the EEOC, he was too frightened to file the EEOC charge at an earlier date, and thus the IDHS should be equitably estopped from raising the statute of limitations to bar conduct that occurred before December 18, 1997. Equitable estoppel, which is also known as fraudulent concealment, applies if the defendant "'takes active steps to prevent the plaintiff from suing in time.'" Jackson v. Rockford Housing Auth., 213 F.3d 389, 394 (7th Cir. 2000) (quoting Hentosh v. Herman M. Finch Univ. of Health Sciences/Chicago Med. Sch., 167 F.3d 1170, 1174 (7th Cir. 1999)). Such active steps "include hiding evidence or promising not to plead the statute of limitations." Jackson, 213 F.3d at 394. We "have refused to grant equitable estoppel when the plaintiff retained the ability, notwithstanding the defendant's delay or resistance, to obtain information necessary to pursue his claim." Jackson, 213 F.3d at 394.

Shanoff does not allege that he lacked the knowledge and ability to file his EEOC charge, as he testified that Sue Varso advised him on how to file the charge as early as March 1997. He claims that he "continued to feel that suing was not an option" because of Riperton-Lewis's threat, in March 1997, that she had friends who "could take care of" him if he filed a charge. Thus, according to Shanoff, the statute of limitations does not apply to his case because his supervisor threatened him in March 1997, and he remained deterred from suing until approximately 18 months later, in October 1998./1 But Shanoff provides no explanation as to why he failed to sue earlier, especially while he was on leave from the Madden Center (and away from Riperton-Lewis) since March 1998. Nor does he explain why he no longer felt deterred from filing in October 1998. Moreover, Shanoff presents no authority by this court (or from any other circuit court) that holds that equitable estoppel applies to situations in which the employee had the knowledge and ability to file his EEOC charge, but was deterred because of employer threats of retaliation. Title VII already makes it unlawful for employers to retaliate against employees who assert their rights under the statute, and thus a remedy already exists for employees who suffer an adverse action by their employers because they pursued a Title VII claim./2 42 U.S.C. sec. 2000e-3(a); Adusumilli, 164 F.3d at 362. If we extended the equitable estoppel doctrine to Shanoff's claim, that would permit Title VII plaintiffs to sidestep the statute of limitations by simply alleging that they were threatened by a supervisor at one time, and thus remained deterred from filing an earlier charge (even, as in this case, for as long as 18 months). But the Supreme Court has emphasized that we must seriously recognize and apply statutes of limitations. See Galloway v. General Motors Service Parts Operations, 78 F.3d 1164, 1165 (7th Cir. 1996) ("the Supreme Court has told us not to interpret statutes of limitations in a grudging, hostile fashion") (emphasis in original). Statutes of limitations "serve the important purpose of encouraging the prompt filing of claims and by doing so of enhancing the likelihood of accurate determinations and removing debilitating uncertainty about legal liabilities." Id.

Thus, we decline to extend the equitable estoppel doctrine to Shanoff's claim.

Shanoff also contends that Riperton-Lewis's harassing conduct that occurred before the limitations period is actionable based on the "continuing violation" doctrine. The continuing violation doctrine allows a plaintiff to get relief for time-barred acts by linking them with acts within the limitations period. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992). Courts then treat such a combination of acts as "one continuous act that ends within the limitations period." Id. We have recognized that hostile environment claims "are often different from complaints about a specific action like a firing or a refusal to promote that happen at a particular time. It is commonly the case that the plaintiff must instead demonstrate that [the continuing violation doctrine applies because] the harm about which [he] is complaining is part of a pattern of conduct, and [he] 'was reasonable not to perceive [his] working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity.'" Russell v. Board of Trustees of the Univ. of Ill. at Chicago, 243 F.3d 336, 343 (7th Cir. 2001) (quoting DeClue v. Central Ill. Light Co., 223 F.3d 434, 435-36 (7th Cir. 2000)). But we have placed limitations on the continuing violation doctrine. Garrison v. Burke, 165 F.3d 565, 569 (7th Cir. 1999). A plaintiff asserting a hostile environment claim cannot procrastinate. He must demonstrate that he sued as soon as it was reasonable for him to conclude that his supervisor's harassment had created an intolerable working environment, or, in other words, "as soon as the harassment becomes sufficiently palpable that a reasonable person would realize [he] had a substantial claim under Title VII." Galloway, 78 F.3d at 1166. If the plaintiff sues in time, then he "can allege as unlawful conduct the entire course of conduct that in its cumulative effect had made [his] working conditions unbearable." Id. But if the harassing conduct that occurred before the limitations period was sufficient to notify the plaintiff that he had a substantial claim under Title VII, the continuing violation doctrine does not

apply and he can only base his claim on conduct that occurred within the limitations period. See DeClue, 223 F.3d at 436.

In this case, the record demonstrates that the continuing violation doctrine does not apply. Shanoff testified that in November 1997, after Riperton-Lewis had directed several hostile remarks at him, he reported to Ms. Steiner, Dr. Formigoni, and Pat Madden that his work environment had become intolerable. Moreover, during that same month, Formigoni and Madden made it clear to Shanoff that the Madden Center would not take any further steps to resolve the situation between him and Riperton-Lewis. See Galloway, 78 F.3d at 1166 (an employer's knowledge of the harassment and negligent failure to take effective remedial measures are normally prerequisites to the employer's being made liable for the harassment). Shanoff was thus on notice in November 1997 that he had a substantial claim under Title VII. But he failed to sue until October 13, 1998, which means that the 300-day limitations period began on December 18, 1997, approximately a month after he knew that his work environment had become intolerable and that the Madden Center would not take any further steps to resolve the situation. Thus, Shanoff does not overcome the statute of limitations dictated by the facts of his case, and his hostile environment claim will be based only on Riperton-Lewis's conduct that occurred on or after December 18, 1997.

Title VII prohibits an employer from maintaining a workplace that is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v. Vinson et al., 477 U.S. 57, 65-67 (1986)). To prevail on his hostile environment claim, Shanoff must show that his work environment was objectively hostile. McPhaul, 226 F.3d at 566. "An objectively hostile environment is one that a reasonable person would find hostile or abusive." Id. at 567 (quoting Adusumilli, 164 F.3d at 361). "In determining whether a plaintiff has met

this standard, courts must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Adusumilli, 164 F.3d at 361 (quoting Harris, 510 U.S. at 23). We can determine whether an environment is hostile or abusive "only by looking at all the circumstances," as "no single factor is required." Harris, 510 U.S. at 23. Regarding the frequency of the harassment, "there is no 'magic number' of incidents that give rise to a cause of action." Doe v. R.R. Donnelly & Sons Co., 42 F.3d 439, 445 (7th Cir. 1994). But repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile environment. See Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993). In order to support his Title VII claim, Shanoff may point to Riperton-Lewis's facially discriminatory remarks, as well as any of her remarks and behavior that may reasonably be construed as being motivated by her hostility to Shanoff's race or religion. See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999) ("The complained of conduct must have either a [religious] or racial character or purpose to support a Title VII claim.") (emphasis in original).

   In this case, Shanoff went on medical leave on March 16, 1998, and thus he worked at the Madden Center for approximately four months during the limitations period (which extends from December 18, 1997 to October 13, 1998). During that period, on seven occasions Riperton-Lewis said things to Shanoff that he relates to his harassment claim: (1) in late December 1997, after Shanoff met with Formigoni to tell him that his health was failing because of Riperton-Lewis's discriminatory conduct, Riperton-Lewis told Shanoff that he "must be pretty stupid because [he] would never learn that she was protected, that Howard Peters [who is black] would protect her, that [Peters] was one of them and that she would see to it that [Shanoff's] white ass--[his] white Jewish ass would be kept down;" (2) during that same conversation, Shanoff told Riperton-Lewis

that his health was failing, to which she responded, "good;" (3) in January 1998, Riperton-Lewis prohibited Shanoff from teaching medical students; (4) Riperton-Lewis had also affirmed to Shanoff that month that she "was going to be able to keep [his] white Jewish ass down;" (5) in late February or early March 1998, Riperton-Lewis again told Shanoff that "she knew how to handle white Jewish males, and once and for all that [he] needed to leave Madden and get out of her hair;" (6) when Shanoff responded that her conduct was harming his health and career, she replied by laughing and dismissing him from her office; and (7) in October of 1998, while Shanoff had been on leave for several months, Riperton-Lewis called him at home to demand that he explain his absence, and when Shanoff asked her "why are you being like this," she responded, "I hate everything that you are."

We first note that a reasonable person may certainly conclude that, from the context of all of Riperton-Lewis's conduct, her remarks that were not facially discriminatory (her expression of satisfaction at Shanoff's failing health, her order not to teach medical students, her disregard of, even delight over, the effect of her harassment on Shanoff's health and career, and her statement, "I hate everything that you are") were sufficiently intertwined with her facially discriminatory remarks to be motivated by her hostility to Shanoff's race and religion. It is "[a]gainst this backdrop [that] we examine [Riperton-Lewis's] actions committed within the limitations period." See Hardin, 167 F.3d at 345-46. Moreover, although the harassing conduct that occurred before the limitations period is time-barred and not actionable, we may consider that conduct (the "haughty Jew" remark, the other facially discriminatory remarks, threats, and other harassment) to illuminate the nature of the hostility involved in the actionable conduct. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977) (time-barred conduct "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."); Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1036 n. 2 (7th Cir. 1998); see also Cortes v. Maxus Exploration Co., 977 F.2d 195, 199-200 (5th Cir. 1992)

(time- barred conduct is relevant and may be used to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives).

In light of all of the conduct in this case, we conclude that Shanoff was subjected to six rather severe instances of harassment during the four months that he was working at the Madden Center during the limitations period (and one more instance of harassment while he was on leave). Riperton-Lewis made three remarks (approximately one remark each month) during the limitations period (from late December 1997 to March 1998) in which she specifically referred to Shanoff by his race and religion in an intimidating manner. Through these remarks, she emphatically expressed to Shanoff her hostility to his race and religion, and that she was motivated by that hostility to impede his career ("keep his ass down"). She also took steps to hinder his career (by prohibiting him from teaching medical students) and to drive him from the Madden Center ("once and for all that [he] needed to leave Madden and get out of her hair"). And despite Shanoff's repeated objections to her harassment, Riperton-Lewis made further discriminatory remarks to him and expressed her approval of his failing health and diminished professional responsibilities. See Saxton, 10 F.3d at 534. She used her supervisory position to bully, intimidate and insult Shanoff because of his race and religion, which is the type of "extreme" harassment that is the hallmark of a hostile environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Riperton-Lewis's remarks were not merely inappropriate, insulting, demeaning or annoying, and there is no indication that she was teasing Shanoff or that she simply lacked a proper sensitivity to his race and religion. In short, the summary judgment record (viewing the facts in a light most favorable to Shanoff) amply demonstrates that Riperton-Lewis's remarks evinced her direct, unambiguous hostility to Shanoff because of his race and religion, and that she was motivated by her hostility to hinder his career at the Madden Center. Thus, Shanoff has presented sufficient facts to enable a reasonable jury to conclude that Riperton-Lewis's harassment created an

objectively hostile work environment.
Accordingly, we REVERSE the district
court's decision and REMAND for further
proceedings consistent with this opinion.

FOOTNOTES

/1 Shanoff also alludes to another threat of "physi-
cal harm" by Riperton-Lewis that occurred some-
time during 1997, but that was not a threat of
retaliation if he filed an EEOC charge.

/2 We also note that if the employer's threats are
criminal in nature, the employee may seek the
protection of the police and the criminal justice
system.