In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1293

Tony Cerros,

Plaintiff-Appellant,

v.

Steel Technologies, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:97-CV-103--Theresa L. Springmann, Magistrate Judge.

Argued September 19, 2001--Decided May 7, 2002

   Before Easterbrook, Diane P. Wood, and
Williams, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Hispanic
employees were few and far between at the
Porter County, Indiana, facility operated
by defendant Steel Technologies, Inc.
("Steel"). Plaintiff Tony Cerros was one,
and he found the environment at Steel to
be exceedingly hostile. He filed this
suit under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. sec. 2000e, et
seq., alleging that Steel discriminated
against him and created a hostile work
environment because of his national
origin and race. After a bench trial
before a magistrate judge (sitting by
consent under the authority of 28 U.S.C.
sec. 636(c)), Steel prevailed, and Cerros
appealed. We conclude that further
proceedings are necessary and therefore
remand this case to the district court.

I

   Cerros began his employment as a full
time employee at Steel in October 1995.
By July 1996, he had risen to the
position of slitter operator. Although
one might think that Cerros's various
promotions were evidence of a positive
work environment, that was far from true.
The district court found that some of the
supervisors as well as other employees
overtly espoused the offensive philosophy

"if it ain't white it ain't right." Cerros himself was frequently subjected to verbal harassment. During 1996 and 1997, employees, including supervisors, referred to him by such racialized derogatory names as "brown boy," "spic," "wetback," "Julio" and "Javier" (these are not Cerros's given or nicknames), talked down to him and muttered comments under their breath. Among the supervisors using racial epithets was Jeff Colvin. In October 1996, Cerros transferred to the first shift to avoid Colvin's harassment. His respite was short-lived: over his protests, Colvin also transferred to the first shift, and the epithets continued.

In addition to the verbal harassment, racist graffiti was painted on the bathroom walls. It included racial remarks and symbols such as "spic," "Go Back to Mexico," "Tony Cerros is a Spic," "KKK," and "White Power." Although the graffiti was cleaned off the walls, Steel never conducted any investigation, nor did it attempt to ascertain who was responsible for the defacement of the room. On another occasion, the tires on Cerros's car were slashed. This severe harassment continued until December 1997, and even beyond.

In addition to harassment based upon his race and national origin, Cerros suffered other disadvantages in the workplace. One that he emphasizes is Steel's failure to train him properly for his position as slitter operator, even as it was providing better training for its white employees. The district court found that Steel used informal, on-the-job training to train its slitter operators. The extent of the training depended upon the trainee's experience, ability, aptitude, and time on the job as slitter helper, as well as on the trainer's experience, ability, and aptitude. Cerros learned to operate the slitter by observing and performing some of the slitter operator functions while he was a slitter helper. He also received supervised instruction when needed. Cerros did not have enough slitter helpers, however, and he believed he was deprived of a slitter helper because of his race and national origin.

In early September 1996, management learned that production was dropping off on the slitter Cerros operated. On September 10, 1996, Colvin met with

Cerros to discuss this problem. When he asked how Cerros was doing, Cerros explained that he needed more training on the machine and that another employee sometimes set his machine up incorrectly when supervisors were not around. Colvin told Cerros that he would be happy to help him, but that production slow-downs would not be tolerated. The following day, Cerros approached Colvin, following up on the previous meeting. During the conversation, Cerros told Colvin that he felt discriminated against as the only Latin-American operator. (Steel employed 150 employees at the Portage site, but it had only 10 Hispanic employees.) Cerros went on to state to Colvin's face that he thought Colvin was racist. Colvin (not surprisingly) denied the accusation, but he also suggested that Cerros speak with the General Manager, Todd Bennett, about the problem.

After that conversation, Colvin himself informed Bennett directly about Cerros's allegation of national origin discrimination. Soon after, Bennett spoke with Cerros about the situation. That was where matters seemed to stop. No one ever investigated Cerros's complaint; it was never passed along to the human resources department; and no remedial steps were taken.

Steel's official policy encourages employees who feel discriminated against first to inform their supervisor of inappropriate behavior. If an employee does not receive a response from her immediate supervisor, she is then encouraged to make an appointment with the Plant Manager. If the problem still remains unresolved, a Step Three procedure is available under which the employee may submit a written summary of the situation to the Plant Manager. The Plant Manager submits his own report to the General Manager, who reviews the situation, discusses it with the employee, and renders a decision within seven days. Last is Step Four, under which there is a final appeal to the Vice President if the employee remains dissatisfied.

Cerros began by informing not only his own supervisor, Colvin, but also other supervisors such as Dan Beal, Kevin Meyers and Russell Harrington of the harassment. Later, as noted above, both

Colvin and Cerros discussed the situation with Bennett, the General Manager. There is no evidence that Cerros sought to appeal Bennett's lack of action to the Vice President. In any event, the epithets continued and nothing was done. It was not until Cerros filed a charge of discrimination with the EEOC that there was an investigation into the harassment, conducted by John Baumann, corporate counsel and manager of human resources during 1996-1997. After interviewing managers and supervisors, who denied the allegations, Baumann concluded that Cerros was not subject to discrimination or harassment. In time, Cerros received his right-to-sue letter from the EEOC and this case followed.

II

Because there was a full bench trial in this case, our standard of review is the one found in Fed.R.Civ.P. 52(a), under which "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). We review the district court's legal conclusions de novo. Johnson v. West, 218 F.3d 725, 729 (7th Cir. 2000).

For the most part, Cerros does not argue the district court's findings of fact were clearly erroneous. His disagreement is with the ultimate conclusion that he was not subject to impermissible discrimination nor to a hostile work environment. As the Supreme Court made clear in Pullman-Standard v. Swint, 456 U.S. 273 (1982), however, the question whether intentional discrimination occurred itself calls for a finding of fact, and thus the district court's decision on that point must be assessed under the clear error standard. Id. at 287.

A. Race and National Origin Discrimination

Cerros begins by arguing that the district court should not have applied the indirect framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973), to his case, and instead should have analyzed his claim under a direct method

of proof. But this is the wrong perspective for a case that had a full trial. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 (1983). We will review the record instead to see whether there was clear error in the district court's conclusion that Cerros failed to prove his discrimination claims.

Although the district court found that there was evidence that co-employees as well as managers directed racial epithets towards Cerros and perpetuated an "if it ain't white it ain't right" philosophy at the plant, the district court did not find that Cerros's supervisors or other agents of Steel used this philosophy in connection with an adverse employment action. In fact, the district court found that Cerros was not subject to any adverse employment action at all.

If the record supports this conclusion, it is fatal to Cerros's claim of discrimination. And on this record, we cannot find that the district court clearly erred. Cerros was promoted twice, and he received a pay increase. Markel v. Bd. of Regents of Wisconsin Sys., 276 F.3d 906, 911-12 (7th Cir. 2002). Even though these are the opposite of adverse employment actions, Cerros argues that he was nevertheless injured when Steel denied him proper training for the position of slitter operator. His theory was that the promotion was a cynical one, and by failing to train him as well as it trained white employees (in keeping with the "if it ain't white it ain't right" philosophy), Steel made sure that he would fail in the new job.

The question is then whether there was evidence of the alleged substandard training, and whether this alone could constitute an adverse employment action. This court has defined an adverse employment action as a "materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000). Rather than setting forth a finite list of what actions constitute adverse employment actions, we have instead provided a range of examples from economic injuries to other actions that

are not as easily quantifiable, but nonetheless are enough to qualify as an adverse change in the terms and conditions of someone's employment. Markel, 276 F.3d at 911; Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).

Yet not every inconvenience or slight on the job is an adverse employment action. Although Cerros argues that Steel's failure formally to train him was more than a mere inconvenience because it placed his position as slitter operator at risk, the evidence before the district court did not compel this conclusion. The district court found that Cerros failed to prove that he was denied training, nor did he prove that supervisors were setting his machines up incorrectly. After reviewing evidence from both parties, the district court determined that Cerros did not suffer any adverse employment action; we see no warrant for disturbing this finding. That in turn means that the district court's ultimate finding that Cerros did not suffer discrimination on the basis of his race or national origin cannot be branded "clearly erroneous," and the district court's judgment for Steel on this claim must be affirmed.

B. Hostile Work Environment

The situation is different with respect to Cerros's claim of a working environment made hostile by racial and ethnic slurs and harassment. A hostile environment claim falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of employment. In order to demonstrate harassment that rises to the level of a statutory violation, the plaintiff must prove that "his or her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Gentry v. Exp. Packaging Co., 238 F.3d 842, 850 (7th Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). The plaintiff must then show that the harassment was based on her membership in a protected class; that the conduct was severe or pervasive; and that there is a basis for

employer liability. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754 (1998); Mason v. Southern Illinois Univ. at Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000).

Most of these points are not in dispute. There is no doubt that Cerros subjectively believed that he was a victim of harassment based upon his race or national origin. Nor is there any question that a reasonable person would perceive that the graffiti, remarks, and other harassing conduct were based upon his race and ethnicity. Cerros made efforts to use the complaint mechanisms that were available even though his supervisor was a big part of the problem. The district court did not consider Steel's affirmative defenses based on Ellerth and Faragher (relating to the adequacy of its complaint mechanism and Cerros's efforts to use it). At this stage, therefore, the question is only whether the district court committed clear error in concluding that the harassment from which Cerros suffered was not severe or pervasive enough to meet the statutory standard.

The Supreme Court established the rules for deciding this issue in its decision in Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993). There it observed that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult [ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Id. at 21 (internal quotations and citations omitted). In carving out a middle ground between making actionable any conduct that is merely offensive, and covering only conduct that causes a tangible psychological injury, the Court emphasized that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." Id. at 22. It is enough that the work environment is objectively hostile or abusive (and is subjectively perceived as such). In answering that question, a court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." Id. at 23. See also Shanoff v. Illinois Dept. of Human Serv., 258 F.3d 696, 704 (7th Cir. 2001).

The importance of considering the entire context of the workplace was later underscored by the Supreme Court in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998). There, in the context of a sex harassment case, the Court observed that "[t]he prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Id. at 81. An inquiry into the objective severity of harassment, it continued, "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Id. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships . . . ." Id. at 82. See also Clark County School Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (stressing again the need to consider all the circumstances).

The district court acknowledged that it had to consider the totality of the circumstances, but its findings of fact fell short of what Harris, Oncale, and Breeden require; moreover, its ultimate conclusion does not seem to have taken into account the underlying facts it found earlier in the opinion. In terms of omissions, we do not know exactly how often the offensive grafitti and taunts appeared, and as pervasiveness is certainly one factor to consider, see Breeden, this is a critical omission. In terms of unexplained inconsistencies, we note that the district court had already found that Cerros was subjected to direct and highly offensive racial epithets by employees and supervisors that referred to him as brown boy, spic, wetback, Julio and Javier. Both supervisors and other employees talked down to him, and muttered things under their breath. In addition, racial epithets and slogans were painted on bathroom walls. Some were about Hispanics (and recall that there were only a tiny number of Hispanics working at the Portage facility). Others touted the KKK and White Power. Some were racially derogatory statements about

Cerros himself, by name. On top of that, the tires on Cerros's car were slashed while he had it parked at work. Although Cerros did not know who slashed his tires or why, he did notify Steel about the incident, and Steel did nothing in response.

The district court never explained why this appalling litany of misconduct was merely "offensive, unenlightened, and inappropriate"--the terms it used in the section of the opinion with the ultimate conclusion that Cerros's claim failed. It characterized the incidents as "relatively isolated," and thus as insufficient to show a hostile work environment. We believe that such a finding may have resulted from a misunderstanding about the legal threshold for harassment cases; like the lower courts in Harris, the district court here may well have set the bar too high as a matter of law. This court has found severe verbal harassment of the sort identified by the district court to be prohibited harassment, even when it did not occur every day. In Shanoff, the plaintiff alleged he was repeatedly harassed with remarks directed towards his race and his religion. The remarks included referring to Shanoff as a "haughty Jew," and stating "I know how to put you Jews in your place." Shanoff, 258 F.3d at 698-99. In all, Shanoff was subjected to six severe instances of harassment by his supervisor. Despite Shanoff's objections to the harassment, the supervisor demonstrated her "direct, unambiguous hostility to Shanoff because of his race and religion." Id. at 706. We found that this behavior rose to an objectively hostile work environment. See also Rogers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to an employee by the term "nigger" between five and ten times while he was employed).

This is not a case where Cerros was a recipient of insults because of a workplace altercation, cf. Spearman v. Ford Motor Co., 231 F.3d 1080, 1086 (7th Cir. 2000); this also is not a case where there were only a few verbal utterances made in the context of office banter, Logan v. Kautex Textron N. Am., 259 F.3d 635, 639; and this case is nothing like

Sanders v. Vill. of Dixmoor, 178 F.3d 869, 870 (7th Cir. 1999), where there was one isolated racial epithet, in response to the plaintiff's already inappropriate conduct. It appears that the epithets at Steel continued for many months, although this is a matter on which greater clarity from the district court is necessary. Adding up all of the derogatory names directed at Cerros as well as all of the graffiti on the bathroom walls, and coupling that with more information about how frequently or how long the abuse endured, the court might well find that both the pervasiveness and the severity measures are high. These are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, see Smith v. Sheahan, 189 F.3d 529, 533-34 (7th Cir. 1999), while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute. While there is no "magic number" of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the "more severe" end of the spectrum. See Rogers, 12 F.3d at 704 ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.").

When Cerros attempted to escape the comments by transferring shifts, the offending supervisor followed him to the new shift. Although, as the district court noted, Cerros was not subject to physical threats, Harris makes it clear that such a showing is not a sine qua non for a harassment claim. Cerros endured a workplace environment filled with slurs and graffiti based on his race and national origin. Steel not only tolerated the harassment, but even worse, according to the facts found by the district court, its supervisors contributed to the harassment. If severe enough, or pervasive enough, this is exactly the sort of conduct Title VII prohibits.

III

Although Title VII does not guarantee a happy workplace, it does provide protection for employees who suffer from discriminatory terms and conditions of

employment through a work environment that is permeated with racial epithets that are tolerated by the employer. Cerros has shown enough here to have the opportunity on remand to demonstrate that he has met the standards established in Harris, Oncale, and Breeden. The judgment of the district court is therefore affirmed in part and vacated and remanded in part. We Affirm the district court's judgment in favor of Steel on Cerros's discrimination claims. We Vacate the judgment on his hostile environment harassment claim and Remand that part of the case for further proceedings. As noted above, because the district court resolved the case in Steel's favor on the basis that no actionable harassment had occurred, it never reached Steel's Ellerth/Faragher affirmative defenses. While Cerros is entitled to more precise findings of fact, Steel is by the same token entitled to have its affirmative defenses considered by the court. We thus remand for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.