# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos.  04-2877, 04-3051, 04-3052, 04-3053,
04-3087, 04-3088, 04-3089 & 04-3090

DIANA L. ALINSKY, individually and
as personal representative of the
Estate of Paul Alinsky, deceased, et al.,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 98 C 6189, 99 C 1738, 99 C 2447
& 99 C 2883—**James B. Zagel**, *Judge.*

_____

ARGUED FEBRUARY 10, 2005—DECIDED JULY 13, 2005

_____


Before MANION, EVANS, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.*  On July 19, 1997, two private
airplanes crashed in mid-air over the Chicago lakefront,
killing all seven occupants. At the time of the crash, both
airplanes were receiving air traffic services from Meigs Field
Air Traffic Control Tower, operated by a private contractor

to the Federal Aviation Administration ("FAA"). The estates and relatives of the decedents filed multiple lawsuits against a number of defendants in state and federal court. This case pertains to the estates' suits against the United States under the Federal Tort Claim Act. The district court granted the United States summary judgment on several claims and held a trial on others. Following the trial, the district court ruled in favor of the United States on the remaining claims. The plaintiffs appeal.

## I.

On July 19, 1997, two airplanes collided in mid-air approximately three miles south of Meigs Field in Chicago, Illinois. All seven occupants of the planes perished.[1]

At the time of the collision, Renee Toone was staffing the air traffic control tower at Meigs Field. Toone worked for Midwest Air Traffic Control, Inc., a private contractor hired by the FAA to provide air traffic control services for Meigs Field. For purposes of appeal, the parties assume that Toone's failure to inform the pilots of the two planes that they were on a collision course was the cause of the fatal crash.

Following the crash, the estates and relatives of the decedents filed numerous suits against various parties, including the City of Chicago, Midwest, Renee Toone, the estates of the pilots of the airplanes which collided, and the pilot of a third airplane flying near Meigs Field. Most of the state court cases were settled, but one was tried. A jury found the pilot of a third airplane, who at the time of the

---

[1]   They were Paul Alinsky, Jeffrey Walker, Colleen Canty, Sheba Van Pelt, Taiciana Phillips, Donetta Ladd, and Barbara Polka.

collision was communicating with Toone about a landing gear problem, liable in the amount of $2,195,416. *Walker v. Segal*, Cook Cty. Cir. Ct. No. 2002-L-2169. The present case involves the estates' consolidated suit against the United States under the Federal Tort Claim Act, 28 U.S.C. §§ 1346 *et seq.* ("FTCA").

The plaintiffs' FTCA suit alleged claims under multiple theories. First, the plaintiffs sought to hold the United States liable, arguing the United States had a non-delegable duty to provide air traffic control services and was thus responsible for Toone's negligence. The plaintiffs also alleged the United States was liable for its own negligence by allowing an allegedly untrained and unqualified controller to staff Meigs tower. Finally, the plaintiffs alleged that the United States was liable because it negligently delayed approving additional staffing at Meigs.

Initially, we must address the timeliness of this appeal. As noted above, the plaintiffs' cases were consolidated. Nonetheless, in issuing its final decision on the matter, the district court issued four separate Memorandum Opinion and Orders, identical except for the caption and the names of the parties. On January 27, 2004, in three of the four cases, the district court also entered a separate final judgment in favor of the United States, each of which was docketed two days later. However, in the lead case, *Alinsky*, No. 98-CV-6189, the district court did not enter a separate judgment, as the final judgment form was inadvertently attached to the last page of the corresponding Memorandum Opinion and Order. Although the Memorandum Opinion and Order in the *Alinksy* case was docketed, the judgment form was not separately entered on the docket, as was done in the other three cases. It was not until June 17, 2004, that the district court entered a separate judgment in the lead case of *Alinksy*, after which all of the plaintiffs filed a notice of appeal on July 21, 2004.

Federal Rule of Appellate Procedure 4(a)(1)(B) provides that when the United States is a party to the action, the notice of appeal must be filed "within 60 days after the judgment or order appealed from is entered." The district court docketed the judgment against three of the plaintiffs on January 29, 2004, but these three plaintiffs did not file a notice of appeal until July 21, 2004, after the district court had entered a separate judgment in the *Alinsky* case on June 17, 2004. However, this court held in *Sandwiches, Inc. v. Wendy's Int'l, Inc.*, 822 F.2d 707 (7th Cir. 1987), that where two cases are consolidated for all purposes, a single judgment not covering all claims and parties is not appealable absent a ruling under Fed. R. Civ. P. 54(b).[2] *Id.* at 709. Because the district court consolidated these cases for discovery and trial, we conclude that the sixty-day time period for filing a notice of appeal did not begin to run until a final judgment was entered for all four cases.

The question then becomes when did the district court "enter" a final judgment in the *Alinsky* case. As noted above, on January 27, 2004, the district court issued its Memorandum Opinion and Order ruling in favor of the Untied States in the *Alinksy* case, and that order was docketed on January 29, 2004. However, Fed. R. Civ. P. 58(a)(1) provides that "[e]very judgment and amended judgment must be set forth on a separate document . . . ." The district court had also prepared a Rule 58 judgment in the *Alinsky* case, but that

---

[2]  Fed. R. Civ. P. 54(b) provides: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third-party claim or when multiple parties are involved, the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

form was mistakenly stapled to the end of the Memorandum Opinion and Order and not separately docketed at that time. Because the judgment form was not a separate document, as required under Rule 58(a)(1), we conclude that judgment in *Alinksy* was not "entered" on January 29, 2004. *See* Fed. R. Civ. P. 58(b)(2) ("Judgment is entered for purposes of these rules: if Rule 58(a)(1) requires a separate document, when it is entered in the civil docket under Rule 79(a) and when the earlier of these events occurs: (A) when it is set forth on a separate document, or (B) when 150 days have run from entry in the civil docket under Rule 79(a)").

The government acknowledges that if the judgment form attached to the Memorandum Opinion and Order is not considered a separate document, then the plaintiffs' appeal is timely because, under Rule 58(b)(2)(B), the time for filing an appeal would not start until June 28, 2004 (150 days from January 29, 2004), and the plaintiffs would have sixty days from that date to file a notice of appeal. The plaintiffs take issue with the government's interpretation of Rule 58(b)(2), claiming that the 150-day provision did not start on January 29, 2004, because the district court did not docket a "separate document" on that date. Rather, the plaintiffs maintain that the time for filing an appeal did not begin to run until June 17, 2004, when the district court entered a separate judgment in the *Alinsky* case. It is unclear why the plaintiffs take issue with the government's view because, under the United States' interpretation, the time for filing an appeal began at a later date. However, we need not worry ourselves with this question or resolve the dispute over the interpretation of Rule 58(b)(2), because under either reading, the notices of appeal filed on July 21, 2004, were timely.

## II.

That brings us to the merits of this appeal. On appeal, the plaintiffs argue that the district court erred in holding that it lacked jurisdiction to consider their claim against the United States under the FTCA based on Toone's alleged negligence. The FTCA provides a limited waiver of the federal government's sovereign immunity. The FTCA grants federal courts jurisdiction over damages claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b). An "employee of the government" includes military personnel and "employees of any federal agency." 28 U.S.C. § 2671. The term "federal agency" expressly excludes "any contractor with the United States." 28 U.S.C. § 2671; *see also United States v. Orleans*, 425 U.S. 807, 814 (1976); *Logue v. United States*, 412 U.S. 521, 526-27 (1973).

In this case, Toone was not an employee of the United States. Rather, she worked for Midwest Air, an independent contractor hired by the United States to provide air traffic control services for Meigs Field. Therefore, under the FTCA, the district court lacked jurisdiction to consider any claims against the United States based on Toone's negligence.

The plaintiffs seek to overcome Toone's status as an employee of an independent contractor by arguing that the United States lacked the authority to hire private contractors to provide air traffic control services. In support of this position, the plaintiffs cite to 49 U.S.C. App. § 1344(h), which was in effect at the time of the accident. That section provided:

> The Secretary may make a contract, on a sole source basis, with a State or political subdivision of a State to

allow the State or subdivision to operate an airport traffic control tower classified as a level I (Visual Flight Rules) tower if the Secretary decides that the State or subdivision has the capability to comply with the requirements of this paragraph. The contract shall require that the State or subdivision comply with applicable safety regulations in operating the facility and with applicable competition requirements in making a subcontract to perform work to carry out the contract.

49 U.S.C. App. § 1344(h).

The plaintiffs maintain that because this section referred only to contracts with the State or a political subdivision, the FAA lacked authority to contract with private organizations to provide air traffic control services. They further argue that an amendment to that section (effective in 2003) confirms their position because Congress subsequently modified the statute to provide that the FAA may enter into contracts for air traffic control services with any "qualified entity." 49 U.S.C. § 47124(b)(2).

The FAA, however, does not rely on these statutory provisions as authority for subcontracting with Midwest. Rather, the FAA relies on several other statutory grants of authority, such as 49 U.S.C. § 106(l)(6), which provides:

The Administrator is authorized to enter into and perform such contracts . . . as may be necessary to carry out the functions of the Administrator and the Administration. The Administrator may enter into such contracts . . . with any . . . person, firm, association, corporation, or educational institution, on such terms and conditions as the Administrator may consider appropriate.

49 U.S.C. § 106(l)(6). The FAA also relies on 49 U.S.C. § 40110, which provides that the Administrator "may

acquire services," and 49 U.S.C. § 40111, which authorizes the Administrator to enter contracts for services, including services for the "operation of facilities and installations."

The provisions the FAA cites clearly authorize the FAA to enter into contracts as necessary, including for services to operate the air traffic control facilities. Nothing in the language of 49 U.S.C. § 1344(h) limits this broad grant of authority. Nor have the plaintiffs pointed to any statutory provisions which prohibit the FAA from hiring private contractors for air traffic control services. In fact, at the time of the accident, the FAA had contracted with private contractors to provide air traffic control services at approximately 130 other air traffic control towers, like Meigs.

Moreover, we find the plaintiffs' reliance on 49 U.S.C. § 1344(h) misplaced. That section spoke of contracting with States or political subdivisions, but did not mention private contractors. Nor did the statute in any way limit the FAA's authority to contract with private contractors—an authority confirmed by other statutory provisions. It would also be illogical to conclude that Congress intended to prohibit the FAA from hiring private contractors to provide air traffic control services where § 1344(h) recognized that the States and political subdivisions had the authority to subcontract out services. *See* 49 U.S.C. § 1344(h) ("The contract shall require that the State or subdivision comply with applicable safety regulations in operating the facility and *with applicable competition requirements in making a subcontract to perform work to carry out the contract.*"). For all of these reasons, we

refuse to read the permissive language of § 1344(h) as prohibitive, or as overcoming the express grant of authority Congress provided in other statutory provisions.[3]

Alternatively, the plaintiffs argue that the FAA is nonetheless liable for Toone's conduct because air traffic control services are nondelegable. In support of their position, the plaintiffs cite Illinois tort cases holding that a principal is liable for torts committed by an independent contractor where the contractor performs abnormally dangerous activities because such activities are nondelegable. However, as the Supreme Court in *Logue* explained, in adopting the FTCA's contractor exception to liability, Congress did not simultaneously adopt the various state exceptions to the independent contractor rule. 412 U.S. at 528. Rather, Congress expressly granted jurisdiction for suits brought against the United States for its employees' conduct, and not the conduct of contractors. State common law principles cannot overcome this federal statute. *See Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997); *Berkman v. United States*, 957 F.2d 108, 112-13 (4th Cir. 1992); *Flynn v. United States*, 631 F.2d 678, 681-82 (10th Cir. 1980); *Alexander v. United States*, 605 F.2d 828, 835 (5th Cir. 1979); *Gibson v. United States*, 567 F.2d 1237, 1243-44 (3d Cir. 1977). *But see Dickerson, Inc. v. United States*, 875 F.2d 1577, 1583 (11th Cir. 1989) (holding that "the independent contractor exception in the FTCA would not insulate the Government from the contractor's negligence if the duty was non-delegable under Florida law"). Accordingly, the plaintiffs' attempts to hold the

---

[3] Furthermore, even if the FAA acted without authority in contracting with Midwest Air, that would not render Toone an employee of the United States government, and Congress only waived immunity for suits brought against United States employees.

United States liable for Toone's conduct fail because she was an employee of Midwest, a private contractor, and not the United States.

The plaintiffs also challenge the district court's decision in favor of the United States on their remaining negligence claims. Specifically, the plaintiffs alleged the United States negligently failed to respond to Midwest's request for funding for additional air traffic controllers, and negligently administered the contract with Midwest by allowing an allegedly untrained and unqualified controller (Toone) to stand watch alone.

First, we consider the plaintiffs' claim that the FAA was negligent in failing to approve Midwest's request for funding for an additional air traffic controller. To fully understand this claim, we must first explain a few additional facts. The contract between the FAA and Midwest required Midwest to take responsibility for staffing and operating the tower at Meigs in accordance with the staffing plan submitted by Midwest with its bid to provide air traffic control services. In its bid, Midwest stated that it would, at times, staff the tower with a single controller. Midwest, however, also agreed to increase staffing "with no increase to the contract price" if it determined that a facility's staffing needed to be increased.

On April 17, 1997, about two months after opening Meigs Tower with the level of staffing it had designated in its bid, namely one controller, Midwest requested additional funding from the FAA's Regional Point of Contract for contract towers in the Great Lakes Region so that it could hire another air traffic controller. Midwest made this request because it had noticed an increase in traffic at Meigs. The request was not marked as an emergency request and therefore was handled in the routine manner, which meant that the Regional Office sent a memorandom to the Federal

Contract Tower Program Office at the FAA headquarters in Washington, D.C., requesting that the contract be modified to increase staffing at Meigs Tower. The Contract Tower Program Office then processed this request, which according to the manager would normally take between six to eight weeks, although in an emergency situation the office has been able to increase staffing within two to three weeks. Following review by the Contract Tower Program Office, the FAA officially approved the request for increased staffing on July 3, 1997, which was a little over two weeks before the accident.

The plaintiffs argue that the FAA was negligent in failing to respond sooner to Midwest's request for additional air traffic controllers at Meigs and that the lack of adequate staffing caused the fatal crash. After a bench trial on this claim, the district court held that the FAA acted reasonably in considering the non-emergency request by Midwest for a contract modification to increase staffing at Meigs Tower. This court reviews that factual finding for clear error. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).

On appeal, the plaintiffs fail to demonstrate that the district court's factual finding was clearly erroneous. They merely posit that the government should have acted faster in response to Midwest's request for additional funding. However, the evidence established that the FAA had no reason to view the request as an emergency and that the FAA responded within the regular time frame necessary for the government to process such requests, and that it approved additional funding more than two weeks before the accident. Moreover, the evidence established that Midwest did not need approval to increase staffing levels at Meigs. As noted above, Midwest's contract with the FAA required Midwest to increase staffing levels if needed. In fact, about two weeks before the accident, Midwest provided a "quick

response team" to help control traffic at Meigs due to an increase in air traffic related to a weekend convention. Therefore, even if the FAA should have processed Midwest's request for additional funding more promptly, that delay did not cause the accident because Midwest was required by the contract with the FAA to assign additional controllers to the tower, if necessary, with or without funding. Thus, the FAA's funding decision did not cause the alleged understaffing.[4] Accordingly, the district court did not clearly err in finding in favor of the United States on the plaintiffs' claim that the United States negligently delayed the approval of additional funding.

Finally, the plaintiffs argue that the United States was negligent because it allowed Midwest to staff the control tower with Toone who, according to the plaintiffs, was not qualified to stand watch alone because she had not completed a required training course and did not have six months' experience at Meigs Field. The government responds that it waived the six-month experience requirement because Meigs Field had just been reopened and thus it was impossible for any controller to have six months of experience at Meigs. As to the training class, the government points out that the class at issue concerned administrative issues and not safety issues,[5] and that Toone had received equivalent training from Midwest.

---

[4] Moreover, the evidence established that even had additional funding been approved, only one controller would have staffed the tower at the time of the accident because the accident occurred in the evening, and Midwest's revised staffing plan called for only one controller after 6:00 p.m.

[5] The plaintiffs admit that "[t]he course itself did not tell the controller how to control aircraft, but rather was directed at what can be described as general facility administration."

While the parties debate the details of the six-month experience requirement and whether it was waived, there is a more fundamental problem with the plaintiffs' negligence claims. The contract between the United States and Midwest required Midwest to staff the control tower with trained and qualified controllers, and it was Midwest's obligation to do so, not the United States'. The district court recognized this fact in granting the United States partial summary judgment on claims premised on negligent oversight or training.

The discretionary function exception to the FTCA provides that no liability shall lie for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Whether the discretionary function exception bars suit against the United States depends upon two factors. *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). First, whether the government employees violated a specific mandatory statute, regulation, or policy, and second, whether the conduct involved was the type of conduct that Congress intended to shield from liability. *Id.* at 536. This latter factor highlights that only governmental actions based upon considerations of public policy are exempt. *Id.* at 537.

Here, Congress authorized the FAA to enter into contracts, as necessary, to carry out the functions of the FAA, and thus the government did not violate a specific mandatory statute, regulation or policy in hiring Midwest to provide training and oversight at Meigs. The plaintiffs also fail to identify any mandatory statute or regulation dictating how the FAA must oversee private contractors or assure the contractor complies with federal regulations and the contract provisions. Where the plaintiffs' claim is premised on negligent

oversight, such a showing is imperative. *See, e.g., Kirchmann v. United States*, 8 F.3d 1273, 1276 (8th Cir. 1993) (holding that the federal regulatory provisions relied upon by the plaintiffs in their FTCA claim did not implicate a mandatory statute because "each regulation governs operations where the Air Force itself, rather than a contractor" performed the specific operation).

Because the plaintiffs failed to establish that the government violated a mandatory statute, regulation or policy, we next consider whether the decision at issue is one Congress intended to protect from liability. In this case, the government's decision to contract out air traffic control services was based on budgetary concerns, as well as a desire to reopen smaller air traffic control locations—both of which are clearly policy decisions. Thus, the discretionary function exemption protects the government from liability for claims premised on the lack of training, oversight, or qualifications of air traffic controllers, since the government acted within its discretion to contract those responsibilities out to Midwest. *Cf. United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) (holding that "actions against the FAA for its alleged negligence in certificating aircraft for use in commercial aviation are barred by the discretionary function exception of the Federal Tort Claims Act," *id.* at 821, because the FAA's decisions as to the manner of enforcing regulations is plainly a discretionary activity, *id.* at 819-21); *Kirchmann*, 8 F.3d at 1276-77 (holding that claims by a farmer and his family against the United States under the FTCA based on groundwater contamination caused during construction of a nearby missile site were barred because any negligence of the government in supervising the contractors' employees was protected under the discretionary function exception to the FTCA). The plaintiffs' remaining claims seek to hold the

United States liable for alleged negligence in the training and staffing of Meigs. These are responsibilities for which the United States, in its discretion, decided to contract to Midwest. As a result, these claims are bared by the discretionary function exemption. Accordingly, the district court properly granted the United States summary judgment on these claims.

Finally, the plaintiffs argue that the district court erred in denying their motion for leave to file an amended complaint. The plaintiffs had requested leave to file an amended complaint after the district court granted the defendants partial summary judgment. The district court denied this motion, finding that all but one issue raised in the proposed amended complaint had been disposed of by the partial summary judgment ruling. The one new issue alleged the United States was negligent in failing to install radar equipment at Meigs. The plaintiffs do not assert this theory on appeal. Rather, they maintain that the district court should have allowed them to amend their complaint to include specific allegations about FAA orders which governed the conduct of FAA controllers. However, as the district court concluded, allowing such an amendment would be futile because the court had already considered the claimed violations of FAA orders in the context of the previous complaint. Moreover, the district court concluded that even if the amendment were not futile, it would nonetheless deny the motion because it would be unduly prejudicial to the United States. Given that the plaintiffs' motion came approximately three years after the start of the litigation and approximately eight months after the plaintiffs completed discovery, the district court did not abuse its discretion in denying the plaintiffs leave to amend their complaint. *See Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir. 1992) (holding that appellate court should overturn a district court's denial of a motion to amend a complaint only if the district court has abused its discretion).

### III.

Paul Alinsky, Jeffrey Walker, Colleen Canty, Sheba Van Pelt, Taiciana Phillips, Donetta Ladd, and Barbara Polka died in a tragic accident. The United States, however, is not liable for their deaths because it did not provide the allegedly negligent air traffic control services, and Midwest, not the United States, was responsible for training and staffing at Meigs. For these and the foregoing reasons, we

AFFIRM.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*