In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1785

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SPECTRUM BRANDS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin
No. 3:15-cv-00371-wmc — **William M. Conley**, *Judge.*

ARGUED NOVEMBER 1, 2018 — DECIDED MAY 9, 2019

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* The district court found that Spectrum Brands, Inc. ("Spectrum") violated section 15(b) of the Consumer Product Safety Act ("CPSA" or the "Act"), 15 U.S.C. § 2064(b)(3), when its subsidiary failed to timely report to the government a potentially hazardous defect in its Black &

Decker SpaceMaker coffeemaker despite years' worth of
consumer complaints about the product. Following an eviden-
tiary hearing as to the appropriate remedy for the reporting
violation, the court entered a permanent injunction which, in
its final form, requires Spectrum to adhere to its newly-
implemented CPSA compliance practices and to retain an
independent consultant to recommend additional modifica-
tions to those practices. Spectrum appeals, contending both
that the government's late-reporting claim is barred by the
statute of limitations, that the district court had no authority to
enter a forward-looking injunction, and that the court other-
wise abused its discretion in awarding permanent injunctive
relief, including the requirement that it engage the expert.
Finding no merit in any of these challenges, we affirm the
judgment.

## I.

Spectrum is a global, diversified consumer products
company headquartered in Middleton, Wisconsin. During the
years relevant to this action, Spectrum distributed to retailers
more than 24 million individual products per year across more
than 500 stock keeping units. Among the products it sold was
a line of under-the-cabinet Black & Decker SpaceMaker
coffeemakers, distributed by its subsidiary, Applica Consumer
Products, Inc. ("Applica").[1]

---

[1] Applica imported the Black & Decker coffeemakers from China and
distributed them to retailers from 2008 to 2012. Applica became a wholly-
owned subsidiary of Spectrum in 2010 and then merged with Spectrum in
2014. At the time of the merger, Spectrum assumed all of the assets and
(continued...)

As a purveyor of consumer products, Spectrum is legally obligated to notify the U.S. Consumer Products Safety Commission ("CPSC" or "Commission") of potentially hazardous defects in any of its products. Specifically, section 15(b) of the CPSA requires a manufacturer, distributor, or retailer of a consumer product "who obtains information which reasonably supports the conclusion that such product" contains "a defect which— … could create a substantial product hazard" to "immediately" inform the Commission of said defect, "unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect … ." 15 U.S.C. § 2064(b)(3). A "substantial product hazard" is one which poses a "substantial risk of injury to the public." *Id.* § 2064(a)(2). The duty to report such a hazard "immediately" means within 24 hours of becoming aware of the hazard. 16 C.F.R. § 1115.14(e).[2] And a manufacturer, distributor, or retailer can be said to have "actual knowledge" that the Commission has already been adequately informed of a defect (relieving it of the obligation to make a report) only if the manufacturer, distributor, or retailer has previously

---

[1] (...continued)
obligations of Applica, and there is no dispute that the assumed liabilities include Applica's liability with respect to the events underlying this case. For the sake of simplicity, then, we have treated Spectrum as the distributor of the coffeemakers at issue here.

[2] The regulations allow a "reasonable time" for a company to investigate the problem with its product when the information in its possession is "not clearly reportable" to the Commission. 16 C.F.R. § 1115.14(c). A period of up to ten days (excluding weekends and holidays) is deemed a presumptively reasonable time period for that purpose. *See id.* §§ 1115.14(a), (d).

disclosed the defect in a section 15(b) report to the CPSC or if the Commission itself indicates that it has already been adequately informed of the defect. 16 C.F.R. § 1115.3(a). Separately, the statute makes it unlawful for any person to "fail to furnish information required by section 2064(b)." 15 U.S.C. § 2068(a)(4).

By February 2009, Spectrum's third-party customer call center had received a number of complaints from consumers regarding the SpaceMaker coffeemakers, including in particular complaints that the plastic handle on the coffeemaker's 12-cup carafe had broken. In one instance, the failure of a handle had caused a consumer to suffer a burn from the hot coffee in the carafe. It appears from the record that when the carafe handle failed, typically its top portion (which was secured by a screw) detached from the glass carafe, while the bottom of the handle (which was fastened by a metal band running around the bottom of the carafe) remained securely in place. This caused the carafe to tip or wobble in the consumer's hand. When the carafe was full of hot coffee, the sudden movement could cause the consumer to spill the coffee or drop the carafe altogether.

In April 2009, in the face of continuing complaints about broken handles, Spectrum commenced an investigation which culminated in a decision to modify the design of the carafe handle. The manufacturer was instructed to cease fabricating the original version of the carafe and to scrap any units already in production. Spectrum began stocking coffeemakers with the modified handle beginning in May. Rather than ceasing sales of the original coffeemakers with the problematic carafe, however, Spectrum implemented a "rolling change" pursuant

to which it continued to sell the older versions so long as they remained in stock. Although Spectrum has assumed that the engineering change fixed the problem with the carafe handle, there is no proof in the record as to whether all of the consumer complaints that Spectrum received about the carafe prior to the eventual recall of the coffeemakers in 2012 were limited to the original version of the carafe.

Meanwhile, Spectrum continued to receive complaints about broken handles on the carafes. By the end of 2009, it had received an additional 300 such complaints, which included more than a dozen reports of burns or lacerations. During this time, the CPSC itself received a report about a faulty handle, and the Commission, consistent with its practice, passed the report on to Spectrum without investigation, reminding the company of its duty under section 15(b) to notify the Commission if Spectrum was aware of a potentially hazardous defect in its product. Spectrum did not file a section 15(b) report at that time.

Over the course of the next two years, the company remained silent about the carafe handle even as more complaints of handle failures and resulting injuries made their way to Spectrum. During this time, the CPSC itself received and forwarded another seven broken-handle reports to Spectrum.[3]

---

[3] The fact that Spectrum did not respond more proactively to the steady stream of complaints appears to have been the result of both a skepticism with respect to consumer complaints generally as well as an internal practice as to when such complaints merited investigatory followup. The coffeemaker, including the carafe, had been thoroughly tested before it was

(continued...)

Not until April 2012 did Spectrum finally file a section 15(b) report with the Commission. The report was what the CPSC called a "fast-track" report which indicated the company's intent to recall the coffeemaker. One month earlier, a class action suit had been filed against Spectrum alleging that there was a design defect in the carafe handle, and that suit evidently persuaded the company that the best course of action was to recall the product entirely, including models with both the original and re-engineered carafe handles. The report as amended advised the Commission that Spectrum had received

_____

[3] (...continued)

placed on the market, so the company had reason to believe that there was no fault in the design of the carafe. The testimony presented to the district court suggests that it is not uncommon for a consumer to complain about a broken product and seek a refund or replacement based on a purported defect in the product, when in fact it is the consumer who has caused the product to break through his own misuse or clumsy handling. Spectrum (really, Applica) thus had a practice of not investigating its products for potential design and/or safety flaws unless a consumer was willing to return the broken product to the company for inspection. Early on, two consumers did return failed carafes to the company, and it was the company's investigation as to those failures that resulted in the re-engineering of the carafe handle in 2009. At that point, Spectrum evidently considered any problem with the carafe to have been solved. The company viewed the ongoing complaints about the carafe as a quality-control problem with the production of the carafe rather than a safety issue. And Applica's prior experience with another coffeemaker, as to which it filed a report with the Commission but was required to take no remedial action, lulled the company into thinking there was no need to file a report as to the Black & Decker carafe.

over 1,600 complaints of handle failures[4] and more than 60 reports of associated injuries to consumers.[5] Two months later, in June 2012, Spectrum and the CPSC jointly announced a recall of the defective coffeemakers.[6] By the time the recall was announced, Spectrum had sold some 159,000 of the coffeemakers, with the majority of them having been sold by December 2009.

Despite the recall, due to gaps in its inventory-control procedures, Spectrum inadvertently continued to sell the recalled coffeemakers.[7] By June of 2013, it had sold another 641 such coffeemakers. A secondary recall was implemented to reach those coffeemakers. At that point, sales of the product finally ceased.

---

[4]  A long-serving CPSC employee would later testify that this number of complaints was extremely high for a product—perhaps the most he had seen in his two decades at the Commission.

[5]  Some 900 of these complaints were received after Spectrum took over Applica, the importer and distributor of the coffeemakers, in 2010.

[6]  A section 15(b) report would ordinarily trigger an investigation by the Commission to determine whether, *inter alia*, a recall of the product was appropriate. However, because Spectrum had signaled its intention to voluntarily recall the coffeemaker, no such investigation was necessary.

[7]  Spectrum had placed a product hold on the recalled coffeemakers, which stopped distribution of units already on its warehouse shelves, but the hold did not reach products in transit from China. When the latter units arrived at the company's warehouse, they were erroneously released for distribution.

In June 2015, three years after Spectrum recalled the defective coffeemakers, the government filed a civil complaint against the company in the district court. As relevant here, the complaint alleged that Spectrum, beginning in February 2009, obtained information reasonably supporting the conclusion that the coffeemakers it was distributing contained a hazardous defect or posed an unreasonable risk of injury, failed to so inform the CPSC for several years thereafter, and thereby knowingly violated section 15(b) of the Act. § 2064(b)(3).[8] The complaint also alleged that Spectrum committed a second violation of the Act by continuing to distribute or sell coffeemakers that it had previously recalled. *See* 15 U.S.C. § 2068(a)(2)(B).

The CPSA authorizes civil penalties of up to $100,000 for each knowing violation of the Act, not to exceed a ceiling of $15,150,000 for "any related series of violations." 15 U.S.C. § 2069(a)(1); 76 Fed. Reg. 71,554, 71,554–55 (Nov. 18, 2011) (providing for inflation-related increases to maximum penalty). The statute also authorizes the government to seek injunctive

---

[8] The statute separately requires the disclosure of a defect which "creates an unreasonable risk of serious injury or death." § 2064(b)(4). The government's complaint contained a count alleging that Spectrum's coffeemaker contained such a defect. However, Spectrum disputed the notion that its coffeemaker posed a risk of causing anything more than minor injuries; and because the district court found that the defect in the coffeemaker could create a "substantial product hazard," *see* § 2063(b)(3), and Spectrum was required to give notice to the Commission on that basis, the court saw no need to determine whether notice was additionally required on the ground that the product posed a risk of serious injury or death. *See United States v. Spectrum Brands, Inc.*, 218 F. Supp. 3d 794, 822 n.24 (W.D. Wis. 2016).

relief in order to "[r]estrain any violation of" the Act. 15 U.S.C. § 2071(a)(1). The government sought both forms of relief in its complaint against Spectrum.

Spectrum did not contest its liability for distributing recalled products, and the district court on summary judgment deemed the company liable for violating its reporting obligation under section 15(b). *United States v. Spectrum Brands, Inc.*, 218 F. Supp. 3d 794, 818–22 (W.D. Wis. 2016). The uncontested facts indicated to the district court that, as early as May 2009 (when the company had already received 60 reports of broken carafe handles and four consumer burns), and certainly no later than June 2010 (by which time it was aware of over 700 handle failures and 35 injuries), Spectrum possessed information supporting a conclusion that the carafe handle on the coffeemakers the company was distributing contained a defect which could create a substantial product hazard. *Id.* at 821–22. Yet, Spectrum did not "immediately" report the problem to the CPSC, as section 15(b) required, but instead delayed its report for another two years. *See id.* at 820–21.

The court rejected Spectrum's contention that the government's section 15(b) claims were barred by the applicable five-year statute of limitations. 218 F. Supp. 3d at 815–17; *see* 28 U.S.C. § 2462. Spectrum's theory was that the limitations period began to run in May 2009, when (as the district court postulated) its duty to report arguably first arose, and expired in May 2014, more than a year before the government filed suit. *Id.* at 815. The court reasoned that the reporting obligation imposed by section 15(b) is a continuing one, such that a company's violation of its duty is not complete until such time as the company finally submits a report to the Commission or

acquires actual knowledge that the Commission has otherwise been adequately informed of the product defect. *Id.* at 817. Consequently, in the district court's view, a cause of action for breach of the reporting requirement does not accrue until this time. *Id.* A contrary understanding, the court pointed out, would encourage a company that has not immediately filed a section 15(b) report with the Commission to continue to withhold information about a product defect until such time as the limitations period has run, and thereby undermine the statutory goal of encouraging the timely reporting of product failures in order to protect the public from harm. *Id.* Deeming a failure to report as a discrete, time-limited violation struck the court as "nonsensical," particularly where the egregiousness of the failure to report increases exponentially over time with continuing consumer complaints of product failures and injuries, as occurred in this case. *Id.*

The court likewise rejected Spectrum's contention that the court lacked authority under the CPSA to impose the forward-looking injunctive relief on the company that the government had sought (in addition to monetary penalties) in its prayer for relief. Because the statute authorizes injunctive relief as necessary to "[r]estrain any violation" of the Act, 15 U.S.C. § 2701(a)(1), the court inferred that its power to award injunctive relief included the power to enjoin future violations. 218 F. Supp. 3d at 823–25. The government, it concluded, had put forth a plausible case that Spectrum's "knowing, arguably outrageous, conduct" warranted such an injunction. *Id.* at 825. The court therefore declined to dismiss this portion of the government's prayer for injunctive relief, reserving judgment

as to whether an injunction was warranted pending further development of the facts. *Id.*

Following an evidentiary hearing as to the appropriate remedies for Spectrum's violations of the CPSA and a thorough canvassing of the criteria set forth in the statute and regulations, *see* 15 U.S.C. § 2069(b); 16 C.F.R. §§ 1119.1, 1119.4; R. 234 at 5–12, the district court issued a decision imposing both fines and a permanent injunction. The court ordered the company to pay civil penalties totaling $1,936,675—$821,675 for the section 15(b) reporting violation and $1,115,000 for the sale of recalled products. R. 234 at 12–16. The court also concluded that the government had established a reasonable likelihood of future violations warranting a permanent injunction requiring Spectrum to reform its internal compliance programs and procedures. R. 234 at 17–21. The court found that a key problem contributing to the company's failure to timely report the problem with its problematic coffee carafe was a lack of communication among employees responsible for evaluating consumer complaints, those employees with knowledge of the product's design and defect, and senior management personnel. R. 234 at 18–19. Similar communication failures, along with the failure to implement relatively simple measures to prevent the distribution of recalled products, largely explained Spectrum's continuing sales of the recalled coffeemaker. R. 234 at 19. The court acknowledged a report prepared by Spectrum's expert witness identifying a number of procedures the company was utilizing to gather, evaluate, and escalate product information that might require reporting to the CPSC. But that report did not address whether these same procedures were in place during prior years, when

Spectrum had failed to report the carafe-handle defect to the
Commission despite ongoing reports of handle failures and
injuries. Nor did the report discuss whether these procedures
were written, disseminated, and enforced within the company
and whether appropriate company personnel were trained in
these procedures. R. 234 at 19. Moreover, so far as the record
revealed, Spectrum had not commissioned an independent
audit to gauge the efficacy of these measures. R. 234 at 21. The
court found it telling that senior engineering and global quality
personnel at Spectrum could not recall meaningful discussions
of the problems with the carafes prior to 2012, notwithstanding
the receipt of consumer complaints beginning in 2009. R. 234 at
20. Consequently, the court was left with serious doubts as to
the efficacy of the efforts Spectrum had undertaken to address
the faults that had caused the company to violate its reporting
obligations under section 15(b) and to prevent the continued
sales of recalled products.

> [Q]uestions … remain regarding the extent to which
> Spectrum has undertaken a meaningful independent
> audit of its CPSA reporting and recall obligations,
> and addressed the deficiencies in its systems and
> programs that led to its violation of these obliga-
> tions. While Spectrum appears to have made some
> efforts to prevent similar violations from occurring
> in the future, the seriousness of its offens[es] to date
> require that the systems that it has in place to com-
> ply with the CPSA should by now be rigorous and
> well-defined. … Accordingly, the court finds that
> plaintiff has made an adequate showing of the need
> for permanent injunctive relief to address Spec-

trum's auditing, compliance and training regarding
compliance with the CPSA's reporting requirement
and post-recall sale prohibition going forward.

R. 234 at 21. The court went on to enter a forward-looking
permanent injunction which, among other things, required
Spectrum to "maintain sufficient systems, programs, and
internal controls to ensure compliance with the CPSA and the
regulations enforced by the CPSC" and to "implement appro-
priate improvements to its compliance programs" within six
months of the court's order. R. 234 at 22. The order also
required Spectrum to disseminate copies of the court's sum-
mary judgment and penalty decisions to its directors, officers,
management personnel, and in-house counsel to the extent
they were involved in the manufacturing and distribution of
consumer products in the United States. R. 234 at 22.

Spectrum filed a motion asking the court for a partial stay
of its judgment. It asked the court to stay both the penalty
imposed for the section 15(b) late-reporting violation as well as
the bulk of the injunction the court had entered, both of which
it intended to appeal.[9] As to the injunction, Spectrum argued
that a stay was warranted, *inter alia*, because the terms of the
injunction were so vague as to render it nothing more than a
command to "obey the law." R. 237 at 5–6; *see E.E.O.C v.
AutoZone, Inc.*, 707 F.3d 824, 841–42 (7th Cir. 2013) (outlining
the concerns presented by such an injunction). Before the court
ruled on the stay request, Spectrum filed its notice of appeal.

---

[9] Spectrum did not seek a stay as to the provision in the injunction
requiring it to distribute copies of the court's summary judgment and
penalty opinions to appropriate company personnel.

The district court subsequently granted the stay request in part, agreeing to place the late-reporting penalty on hold but not the injunction. R. 243. The court acknowledged that in setting forth what the injunction required of Spectrum, it might have "fall[en] short" of the specificity required by Federal Rule of Civil Procedure 65(d)(1)(B) and (C). R. 243 at 4. With an eye to correcting that problem, the district court ordered Spectrum to file a memorandum detailing the specific steps it had already taken to ensure compliance with the CPSA and the CPSC's regulations; it also ordered the government to file a response as to the sufficiency of the measures Spectrum had taken along with any proposals of its own. R. 243 at 4.

After reviewing the memoranda the parties subsequently submitted, the court issued an opinion which modified the terms of the injunction in order to clarify what specific conduct would constitute compliance with the injunction's directive to improve and maintain sufficient systems, programs, and the like to ensure compliance with the statute and regulations. *United States v. Spectrum Brands, Inc.*, 2018 WL 502736 (W.D. Wis. Jan. 19, 2018). Cognizant of the limits on its authority to alter the injunction in view of Spectrum's pending appeal, the court proceeded on the assumption that it could, at a minimum, "preserve the status quo pending appeal and clarify the injunction's specific requirements." *Id.* at *2; *see* Fed. R. Civ. P. 62(d) (as amended effective 12-1-2018); *Newton v. Consol. Gas Co. of N.Y.*, 258 U.S. 165, 177–78, 42 S. Ct. 264, 267 (1922); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994). Toward that end, the court incorporated into the injunction six specific measures that Spectrum represented it had already taken to improve its compliance processes and

which the court found to be "consistent with the spirit of [its] original permanent injunction, if not its letter." 2018 WL 502736, at *3.[10] As modified, the injunction required Spectrum to:

(1)     Maintain the position of Senior Director, Global Quality (or its equivalent) with qualifications and authority to monitor (and if necessary, enhance) Spectrum's policies to ensure future product quality and safety;

(2)     Regularly track product safety information, including product return rates, call center data, and product "star" ratings by consumers on various websites, and evaluate that information to determine whether issues are being identified and appropriately handled;

(3)     Document calls and written communications regarding potential and actual incidents and injury information, collect products that are the subject of reports by consumers or retail partners of potential safety issues, analyze those products *and* bring the results of any such analysis to the attention of Spectrum's Senior Director, Global Quality (or its equivalent), and

---

[10] Spectrum had evidently begun to implement some reforms to Applica's compliance procedures when Applica first became a subsidiary of Spectrum in 2010.

others as appropriate, to determine whether Spectrum has a reporting obligation to the CPSC;

(4)     Implement a formal "Request for Corrective Action" procedure whereby quality engineers and products safety managers can make a request to change a product based on various factors, including consumer complaints and incidents;

(5)     Maintain a "Product Hold Process" (or its equivalent) through which the manufacture and distribution of products can be placed on hold for design issues, manufacturing issues, performance issues, and safety issues, including any and all such products that may be returned to Spectrum by a warehouse, distributor, customer or otherwise to prevent the sale of recalled products; and

(6)     Ensure compliance training of responsible employees on CPSA and/or CPSC regulations, particularly with respect to section 15(b)'s reporting requirement under 15 U.S.C. § 2064(b)(3)-(4) and the prohibition of the sale of recalled products under 15 U.S.C. § 2068(a)(2)(B).

*Id.* at *2–*3, *4–*5 (emphasis in original). The court agreed with the government, however, that these measures by themselves might not be sufficient to ensure Spectrum's compliance with its legal obligations and avoid a repetition of the events that

had brought Spectrum into court here. *Id.* at *4. The court accepted the government's suggestion that Spectrum be required to engage a professional consultant from outside the company to evaluate Spectrum's compliance processes and make recommendations for additional improvements. In the court's view, "[h]iring an outside consultant is a straightforward, specific way for Spectrum to ensure its good faith compliance with the permanent injunction, rather than continuing to live under the vagueness of the admonition to 'obey-the-law' currently contained in the permanent injunction." *Id.* The court therefore added the following command as a final measure Spectrum was required to undertake:

(7)   Defendant shall retain, at its own expense, an independent expert, who, by reason of background, training and education is qualified to assist in reviewing and recommending changes, if necessary, to Spectrum's comprehensive safety program for CPSA compliance, with particular emphasis on compliance with the section 15(b) reporting requirement and procedures necessary to prevent the sale of recalled products.

a.   The parties may have 90 days to agree upon an independent expert, or if the parties cannot reach agreement, for each party to designate one expert with whom the court will consult to identify a neutral expert.

b.   Following the retention of the neutral expert and that expert's review, Spectrum

> shall have 120 days to implement the rec-
> ommendations made by that expert in good
> faith, unless within 30 days of receiving a
> recommendation, Spectrum files a written
> challenge in this court on the basis that it is
> unreasonable (in timeframe or otherwise)
> or overreaches the number or severity of
> defendant's past violations of the CPSA, in
> which case Spectrum need only implement
> that recommendation by further order of
> this court.

*Id.* at \*4, \*5. The court then added the following provision:

> (8)   Compliance with ¶¶ 1–7 shall be deemed good
> faith compliance with this permanent injunc-
> tion.

*Id.* The court recognized that the command to engage an expert, in contrast with the other requirements it had imposed, went beyond maintaining the status quo. It therefore stayed enforcement of that requirement pending appeal. *Id.* at \*4.

In view of these alterations to the injunction, the government asked this court to treat the district court's decision as an indicative ruling, *see* Fed. R. Civ. P. 62.1(a)(3), and remand the case to the district court so that the district court could re-enter the injunction as modified and eliminate any question about the district court's authority to do so with an appeal already pending. *See* Fed. R. App. P. 12.1; Seventh Circuit Rule 57; *In re Cent. Ill. Energy Coop.*, 847 F.3d 873, 874 (7th Cir. 2017) (Ripple, J., in chambers); *United States v. Ray*, 831 F.3d 431, 436, 438 (7th Cir. 2016); *United States v. Taylor*, 796 F.3d 788, 792 (7th Cir.

2015); *Mendez v. Republic Bank*, 725 F.3d 651, 656, 660 (7th Cir. 2013). The government reasoned that although the majority of the specifications the court had added to the injunction arguably could be characterized as simple clarifications that were entirely permissible despite the appeal, the directive to engage an expert consultant was a more substantive change that might have exceeded the court's limited authority.

We granted the government's motion, remanded the case to the district court, and dismissed Spectrum's appeal. 2018 WL 2228179 (7th Cir. Feb. 23, 2018) (Bauer, J.). On remand, the district court re-entered the injunction as modified, 2018 WL 1704773 (W.D. Wis. Apr. 9, 2018), and Spectrum took a fresh appeal from the new judgment.

## II.

Spectrum's appeal is focused on two aspects of the remedies the district court ordered for its violations of the CPSA. It contends that the district court lacked authority to impose the $821,000 penalty for its section 15(b) reporting violation, because the government's suit on that violation was barred by the statute of limitations. Spectrum does not otherwise challenge the propriety or calculation of the penalty for failing to report, nor does it challenge in any respect the $1.1 million penalty the district court ordered for continuing to sell the SpaceMaker coffeemakers in question after they were recalled. As for the injunction the court entered, Spectrum presses several arguments: that the court lacked authority to enter forward-looking injunctive relief; that it abused its discretion in thinking such relief was appropriate in this case; and that the

court abused its discretion in requiring the company to engage an outside expert.

A.  Statute of limitations for reporting violations

Section 15(b) does not specify a limitations period for failure-to-report claims, so we look to the default, catchall limitations provision for civil penalty actions set forth in 18 U.S.C. § 2462. In relevant part, that provision specifies that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued … ."

Spectrum argues that because its duty under section 15(b) was to "immediately" report a potentially hazardous defect in its product, and because the regulation makes clear that "immediately" means within 24 hours of obtaining information reasonably pointing to the existence of such a defect, the government's cause of action for Spectrum's failure to make a timely report first accrued no later than May 2009, by which time the company had received from consumers 60 reports of broken carafe handles and four burns associated with such failures. In its summary judgment decision, the court found that Spectrum arguably had a duty to make a report to the Commission at that point. 218 F. Supp. 3d at 821–22.[11] In

---

[11]  The court went on to find that Spectrum had a duty to make a section 15(b) report no later than June of 2010. 218 F. Supp. 3d at 822. But as Spectrum points out, the court for purposes of calculating the monetary penalties it imposed on the company took into account the consumer complaints received in 2009. R. 234 at 13. So for the purposes of resolving

(continued...)

Spectrum's view, the five years that section 2462 allowed for filing suit thus began to run in May 2009 and expired in May 2014, roughly 13 months before the government actually filed its complaint.

Like the district court, and for the same reasons, we reject Spectrum's contention that the government filed suit too late. Because, as we shall explain, Spectrum's failure to report is properly understood to constitute a continuing violation of its statutory reporting obligation that did not end until Spectrum finally submitted a section 15(b) report in 2012, the statute of limitations did not begin to run until that time. The government thus had five years from the filing of Spectrum's section 15(b) report to file suit, and it did so well before the limitations period expired in 2017.

Spectrum contends that the Supreme Court's decision in *Gabelli v. SEC*, 568 U.S. 442, 133 S. Ct. 1216 (2013), forecloses the notion that the failure to make the report required by section 15(b) is a continuing violation, but because that case addressed the discovery rule—which the government is not relying upon here—the case is, in our view, inapposite. In *Gabelli*, the government had filed a civil enforcement action charging the defendants with securities fraud and seeking monetary penalties for the fraud some six years after the alleged scheme of securities fraud had ended; as here, section 2462 supplied the applicable statute of limitations—five years. The government contended the suit was timely because it had only

---

[11] (...continued)

Spectrum's argument, we shall assume that its duty to report arose in May 2009.

discovered the fraud after the scheme was over, and less than five years before filing suit. However, after noting that the "standard rule" in such cases was that a claim accrues "when the plaintiff has a complete and present cause of action," *i.e.*, when the fraud occurs, *id.* at 448, 133 S. Ct. at 1220 (quoting *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 1095 (2007)), the Court concluded that this was "the most natural reading of [section 2462]," *ibid.* The Court rejected the government's invitation to invoke the discovery rule in order to lengthen the time in which it could bring a suit in such a case. The Court found no "textual, historical, or equitable reasons to graft a discovery rule onto the statute of limitations of § 2462." *Id.* at 454, 133 S. Ct. at 1224. "The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury." *Id.* at 450, 133 S. Ct. at 1222. The government was not in a position to claim the benefit of this rule in *Gabelli*.

The government was not a victim seeking recompense for a self-concealing fraud; rather, it was a regulator seeking to enforce the securities statutes through civil penalties. And in the Court's view, the equities did not warrant giving the government in the latter capacity the benefit of an extended statute of limitations. Whereas the typical fraud victim "do[es] not live in a state of constant investigation" and will have no reason to cause to search for wrongdoing in the absence of an apparent injury, the very purpose of a regulatory agency like the S.E.C. is to root out fraud, and such an agency—unlike the ordinary private plaintiff—has any number of tools at its disposal to do so. *Id.* at 450–51, 133 S. Ct. at 1222. And, whereas a private victim of fraud typically brings suit seeking recom-

pense for his injury, the government in an enforcement action seeks "penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers." *Id.* at 451–52, 133 S. Ct. at 1223. Moreover, given the arsenal of investigatory tools available to the government, determining when it should have been able to discover that a fraud had occurred presents unique and difficult questions not ordinarily presented in a case of a fraud perpetrated upon a private person. *Id.* at 452–53, 133 S. Ct. at 1223–24. "Applying a discovery rule to Government penalty actions is far more challenging than applying the rule to suits by defrauded victims, and we have no mandate from Congress to undertake that challenge here." *Id.* at 454, 133 S. Ct. at 1224.

The government in this case is not arguing that the statute of limitations should be extended until such time as it had reason to know of Spectrum's failure to comply with its reporting obligation under section 15(b). It is, instead, arguing that Spectrum's failure to report the defect in its product was a continuing violation that did not cease until such time as the company at last filed a section 15(b) report with the CPSC. *Gabelli* sheds no light on whether a defendant's violation of any statute, let alone section 15(b), amounts to a continuing violation.

The discovery rule and the continuing violation doctrine are both equitable doctrines, but they serve different purposes and operate in different ways. The discovery rule is designed to protect a plaintiff who through no fault of his own does not learn that a defendant has caused him harm until the limitations period has already run; the discovery rule thus delays the accrual of his cause of action until such time as he reasonably

could have discovered the defendant's wrongdoing. *See Gabelli*, 568 U.S. at 449, 133 S. Ct. at 1221; *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 444 (7th Cir. 2005); *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 799, 801 (2d Cir. 2014). The continuing violation doctrine, on the other hand, is aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time; the doctrine serves that end by treating the defendant's misconduct as a continuing wrong and deeming an action timely so long as the last act evidencing a defendant's violation falls within the limitations period. *See Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992); *Miami Nation of Indians of Ind., Inc. v. Lujan*, 832 F. Supp. 253, 256 (N.D. Ind. 1993), *j. aff'd*, 255 F.3d 342 (7th Cir. 2001); *see also O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 (9th Cir. 2000). Thus, where the violation at issue can be characterized as a continuing wrong, the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete. *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983) ("the statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with").

Our decision in *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999), addresses the question of when a defendant's statutory transgression is properly understood to be a continuing violation to which this doctrine would apply. *Yashar*, a criminal

case,[12] recognized that an offense is ordinarily deemed to have been committed—thus triggering the statute of limitations—when each element of the offense is present. *Id.* at 875. But continuing offenses, *Yashar* recognized, are an exception to that rule. We explained that a criminal offense is treated as continuing only if the substantive criminal statute explicitly compels that conclusion *or* if "'the nature of the crime involved is such that Congress must assuredly have intended it be treated as a continuing one.'" *Id.* (quoting *Toussie v. United States*, 397 U.S. 112, 115, 90 S. Ct. 858, 860 (1970)). "The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that 'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred." *Id.* (quoting *Toussie*, 397 U.S. at 122, 90 S. Ct. at 864). We later added that when assessing the nature of an offense, the appropriate focus is not on the nature of the defendant's actions, but rather on the statutory language defining the offense. *Id.* at 877. "If the statute describes an offense that by its nature continues after the elements have been met, then the offense is a continuing one regardless of the nature of defendant's actions beyond that point." *Id.*

In our view, the terms and purpose of section 15(b) leave no doubt that the failure to report a defect is a wrong that continues beyond a company's initial failure to report. The statute requires a consumer products manufacturer, retailer, or

---

[12] The continuing violation doctrine, of course, is not limited to the criminal context. *See, e.g.*, *Taylor*, 712 F.2d at 1118; *Miami Nation*, 832 F. Supp. at 256.

distributor which comes into possession of information supporting the conclusion that its product has a potentially hazardous defect to file a report with the Commission; the company is relieved of that obligation only if it knows that the Commission has already been properly informed of that defect. Although, as Spectrum naturally emphasizes, the company's duty is to make an *immediate* report, which the regulation defines to mean within 24 hours of the company coming into information regarding the hazard posed by its product, there is no reason to think that the company's dereliction of its duty is a one-time defalcation that is complete for statute of limitations purposes once 24 hours have passed without the filing of a report. The statutory obligation, after all, is to convey information to the Commission so that it may take action as necessary to protect the public from the potential harm posed by the company's product. *See Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 944 (7th Cir. 1988) ("The Commission had come to rely heavily on reports from manufacturers and sellers and views underreporting as a serious problem."); *Drake v. Honeywell, Inc.*, 797 F.2d 603, 611 (8th Cir. 1986) ("Compliance by manufacturers, distributors, and retailers with section 15(b) obviously is critical to the fulfillment of the congressional purpose, to 'protect the public against unreasonable risks of injuries associated with consumer products.'") (quoting 15 U.S.C. § 2051(b)(1) (1982)); *United States v. Advance Mach. Co.*, 547 F. Supp. 1085, 1090 (D. Minn. 1982) ("Congress intended to increase the likelihood that a substantial product hazard will come to the attention of the Commission in a timely fashion so that it c[an] act swiftly to protect the consuming public."). Nothing about the significance of that information or the need

for governmental intervention changes with the passage of time in and of itself: So long as the defective product is offered for sale and otherwise remains in use by consumers, the potential danger presented by the product and the need for action to address that danger remain unabated. Thus, although a product distributor may have breached its obligation under section 15(b) by sitting on information regarding a product hazard for more than 24 hours, its transgression continues so long as it fails to file the requisite report with the CPSC. To paraphrase *Yashar*, once a company has omitted to "immediately" inform the Commission of a potentially hazardous product defect, the elements of its statutory breach are present, but the wrong manifested by its silence perdures beyond the initial failure to make a timely report. The fact that the statute relieves the manufacturer, distributor, or retailer of the duty to report only when the company has actual knowledge that the Commission already knows about the defect reinforces the point: the duty is tied to the Commission's awareness of the defect rather than the passage of any arbitrary period of time. *See United States v. Michaels Stores, Inc.*, 2016 WL 1090666, at *2 (N.D. Tex. Mar. 21, 2016) (duty to report under section 15(b) is continuing one and limitations period does not begin to run until defendant has actual knowledge that Commission is adequately informed of product defect); *Advance Mach.*, 547 F. Supp. at 1089–92 (same); *cf. Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1379–80 (D.C. Cir. 1980) (construing mortgage lender's failure to make specified disclosures to borrower regarding certain fees and closing costs before loan commitment letter is issued, as required by Truth-in-Lending Act, 15 U.S.C. § 1639(b) (1976), to constitute limited continuing

violation—inhibiting buyer's ability to compare bank's offer with others—that lasted beyond issuance of commitment letter until such time as disclosure was made at settlement, at which point borrower could still walk away without signing loan agreement).

The facts of this case reveal that Spectrum's failure to report the potential danger posed by its carafe was continuing in a second sense. Spectrum did not come into information revealing the hazard on one occasion, but on many occasions in the years that it remained silent. Recall that by the time Spectrum finally filed its section 15(b) report, it had received over 1,600 complaints from customers. Each time it received a consumer complaint regarding a carafe failure, Spectrum had a fresh opportunity and obligation to consider the potentially hazardous nature of its product and to reassess its reporting obligation. And with each new complaint, it would have become more clear to Spectrum that the incidents its customers were reporting were not flukes, and that carafe failures and consumer injuries would continue so long as the defective version or versions of the carafe remained in circulation. To say then, as Spectrum does, that both its duty to report and its failure to report were ripe at a single point in time—May 2009—and that the limitations period began to tick irrevocably at that time, is to ignore that the potential hazard posed by its product persisted beyond that point, and with each additional complaint of a carafe failure, the company was placed on renewed notice of an ever more compelling need to act. These complaints continued right up until the time that Spectrum finally filed its section 15(b) report with the CPSC in 2012. To paraphrase *Yashar*'s rationale again, each day that Spectrum did not

make a report to the Commission brought a renewed threat of the evil that Congress sought to prevent by requiring a company to report a possible hazard with its product. 166 F.3d at 875. Whether one views Spectrum's silence in response to each new complaint as a separate violation of section 15(b), or instead sees the unending stream of complaints as a manifestation of the continuing risks posed by the company's failure to report the hazard to the Commission, it is clear that the nature of Spectrum's wrongdoing cannot logically be confined to one point in time but must be seen as a continuing wrong. *See O'Loghlin v. Cnty. of Orange, supra*, 229 F.3d at 875 ("an important purpose of the continuing violation doctrine is to prevent a defendant from using its earlier illegal conduct to avoid liability for later illegal conduct of the same sort"); *cf. Birkelbach v. S.E.C.*, 751 F.3d 472, 479 (7th Cir. 2014) (on review of order disciplining securities principal for failure to supervise associate, it would be "absurd" to treat failure to supervise as single indivisible act which accrued, for limitations purposes, on first day of failure to supervise and to ignore fact that failure of supervision persisted thereafter: "Under [defendant's] interpretation, if an unethical supervisor were to avoid detection for five years, he could continue his unethical behavior *forever* without [the government] being able to discipline him.").

Against this logic Spectrum invokes our decision in *United States v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013), which declined to construe the failure to obtain a pre-construction permit as required by statute to be a continuing violation. The provision of the Clean Air Act at issue in *Midwest Generation* required the operator of power plants and other "major emitting facilities" to obtain a construction permit before

commencing substantial modifications to their facilities. 42
U.S.C. § 7475(a). A permit was required, in relevant part, in
order to give regulators the opportunity to condition approval
of the proposed modifications upon the installation of the best-
available pollution-reducing measures. Between 1994 and 1999,
Commonwealth Edison Co. ("ComEd") made modifications to
five of its coal-fired power plants without first obtaining
permits; ComEd contended that the nature of the modifications
it made to the plants did not require permits. The government
disagreed, but it did not file suit to enforce the permit require-
ment until 2009, a decade or more after the modifications were
made. ComEd invoked the five-year limitations period
specified by section 2462 and argued that the suit was un-
timely. As relevant here, the government excused the delay by
arguing that ComEd's failure to obtain the permits mandated
by the statute was a continuing violation that persisted beyond
the point at which work on the modifications began.

We understood the government's argument to posit that
"every day a plant operates without a § 7475 permit is a fresh
violation of the Clean Air Act." 720 F.3d at 647, and we rejected
that contention:

> The violation is complete when construction com-
> mences without a permit in hand. Nothing in the
> text of § 7475 even hints at the possibility that a fresh
> violation occurs every day until the end of the
> universe if an owner that lacks a construction permit
> operates a completed facility. *Gabelli* tells us not to
> read statutes in a way that would abolish effective
> time constraints on litigation.

*Id.* We went on to reject the government's follow-up contention that the suit was nonetheless timely because ComEd's failure to obtain the requisite permits—the issuance of which would have been conditioned on ComEd's installation of the best-available pollution control technologies—had resulted in continuing injury to the public in the form of power plant emissions that were higher than they would have been had permits been sought. Current plant emissions were governed by rules other than section 7475, we pointed out, and those emissions could not be characterized as "unlawful" simply because ComEd had never obtained construction permits within the (expired) limitations period. *Id*. at 648. "Once the statute of limitations expired, Commonwealth Edison was entitled to proceed as if it possessed all required construction permits." *Id.*; *accord Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 672 (10th Cir. 2016) ("It is the act of constructing itself [without a permit] that is unlawful.").

*Midwest Generation* is distinguishable in material respects from this case. The statute at issue in *Midwest Generation* incorporated an explicit and obvious external deadline for the obligation it imposed: the company was required to obtain a permit before construction commenced. There is no compara-ble deadline set forth in section 15(b): the statute calls for a timely (*i.e.* immediate) disclosure, but it does not tie that disclosure to some other event or point in time akin to the commencement of construction. *See Colo. Dep't of Public Health & Environ. v. U.S.*, 2019 WL 1147601, at *8 (D. Colo. Mar. 13, 2019). Moreover, when the deadline in *Midwest Generations* came and went with the commencement of construction, the nature of the problem changed materially from a regulatory

standpoint. Once the utility company had modified its power plants, permits were a moot point; there was no longer an opportunity for regulators to review the proposed modifications and condition those modifications upon the installation of better pollution controls. The harm post-construction was now higher emissions of pollutants, and that harm, as we pointed out, was subject to remedy via different statutory provisions. By contrast, the wrongfulness of Spectrum's failure to disclose the potential defect in its product neither ended nor transmogrified into a different form as of any particular time. At all times, the failure to disclose deprived the Commission of the opportunity to investigate the product and take appropriate action (including a product recall) in order to protect consumers; and that wrong and the hazard it posed could be addressed no matter how long it took for Spectrum to make its disclosure to the Commission.

Nor are we persuaded by Spectrum's contention that the single express reference to a continuing violation in one section of the CPSA's civil penalty provision, 15 U.S.C. § 2069, rules out treating a section 15(b) violation as a continuing wrong. The provision in question treats each failure to keep appropriate records and allow an inspection of those records, *see* 15 U.S.C. § 2068(a)(3), as a separate violation of the act for purposes of calculating the appropriate penalty (to be capped at $100,000 per violation), and "if such violation is a continuing one," treats each day that the violation persists as a separate offense (subject to a maximum penalty of $15 million, as adjusted by inflation), § 2069(a)(1). The recognition that one type of violation of the CPSA (a failure of record-keeping) can be a continuing offense, for penalty assessment purposes, does

not rule out the possibility that another violation, including the failure to report a potentially hazardous product defect, can be a continuing offense for limitations purposes. *See Advanced Mach.*, 547 F. Supp. at 1090.

We have not overlooked a recurring theme in Spectrum's arguments—that treating a failure to report as a continuing violation is, if nothing else, inconsistent with the "first accrues" language of section 2462. The company reasons that so long as Spectrum had come into the requisite information about a possible product hazard and failed to make a report within 24 hours, it was in violation of the statute and all elements of the government's cause of action were established; thus, the government's reporting claim first accrued at that time, and the limitations clock began to tick, giving the government five years from that date to commence suit.

There is a superficial logic to this line of argument, but it fails to recognize the underlying rationale of the continuing violation doctrine. Cases applying this doctrine recognize that the elements of a crime or a civil statutory violation may be present early on in the course of a defendant's wrongdoing, so that the government, if it were aware of the wrongdoing, would be free to pursue a charge. But given the continuing nature of the underlying wrong, the doctrine delays the accrual of the government's cause of action, *for limitations purposes*, until the defendant's last act. *See United States v. Elliott*, 467 F.3d 688, 690 (7th Cir. 2006) ("All continuing offenses work the same way. Someone commits the crime of conspiracy by agreeing to commit a future crime (and, for some conspiracy statutes, by committing an overt act); he may be prosecuted even if he repents ere the clock strikes midnight. The offense

nonetheless continues (for limitations purposes) until he withdraws or is captured. Likewise the crime of escape, complete when the prisoner leaves custody, continues until he turns himself in or is nabbed."); *Yashar*, 166 F.3d at 875–76; *Womack v. Brady McCasland, Inc.*, 2017 WL 2828708, at *6 (S.D. Ill. June 29, 2017) (civil case) (applying Illinois law). So although nothing would have prevented the Commission from bringing suit in May 2009 had the Commission been aware of the material facts, the continuing violation doctrine delayed the clock from running on the government's right to bring suit until such time as Spectrum filed its section 15(b) report and its ongoing violation of the statute ended.

We recognize that *Gabelli* admonishes us not to construe a statute of limitations in such a way as to "abolish effective time constraints on litigation." *Midwest Generating*, 720 F.3d at 647. But, for all of the reasons we have explained, the duty to report a potentially dangerous defect in a product so that the Commission can take appropriate action to protect consumers is necessarily an ongoing duty which, by the terms of section 15(b), does not end until such time as the product's maker, distributor, or seller either makes a report or actually knows the Commission has been properly informed. At all times, it was within Spectrum's ability to start the clock running on the government's cause of action by filing a section 15(b) report. The filing of such a report entails minimal time and effort.[13] It could not have been the intent of Congress to treat the failure

---

[13] Testimony presented to the district court indicates that the appropriate reporting form can be filled out and submitted to the Commission via the internet within a matter of minutes.

to make such a report as a "one and done" event that confines a company's duty, for limitations purposes, to the earliest possible point in time and effectively ignores the stream of consumer complaints presented to the company in the ensuing months and years, the many opportunities the company had to reevaluate its obligation to report, and the missed opportunities for the Commission to take remedial action to protect consumers.

This action is therefore timely. For purposes of the statute of limitations, Spectrum's wrongdoing did not end, and the government's cause of action did not first accrue, until April 2012, when the company finally complied with its section 15(b) obligation by filing a report with the Commission.

## B. Propriety of permanent injunction

Spectrum also challenges the permanent injunctive relief awarded by the district court. As we have noted, Spectrum contends in the first instance that the court had no authority to enter a permanent, forward-looking injunction in the absence of an ongoing violation of the CPSC. Beyond that, the company argues that it was an abuse of discretion for the court to order such relief here, and in particular to require the company to engage an expert to evaluate its compliance procedures and make recommendations for improvements.

We reject at the outset Spectrum's contention that the CPSA does not authorize forward-looking injunctive relief. Section 22(a) of the Act authorizes a district court to "[r]estrain any violation of section 2068 of this title." 15 U.S.C. § 2071(a)(1). "Any" is a broad term that to our mind, and contrary to Spectrum's understanding, is not limited to ongoing violations

of the statute but also encompasses prospective violations as well. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S. Ct. 1456, 1471 (1972) (recognizing that "any" is a broad, inclusive term); *cf. Manning v. United States*, 546 F.3d 430, 436 (7th Cir. 2008) (rejecting plaintiff's contention that provision of Federal Tort Claims Act, 28 U.S.C. § 2676, specifying that judgment in FTCA action constitutes a complete bar to "any action" by claimant, applies only to future actions: "Section § 2676 applies to 'any action'; 'any' means 'any,' regardless of the sequencing of the judgments."). Indeed, given that an injunction by its nature regulates the conduct of the enjoined party going forward, *Shore v. United States*, 282 F. 857, 859 (7th Cir. 1922) ("Relief by injunction looks toward the future."), the natural assumption, in the absence of an express limitation on the court's power, would be that Congress intended to authorize injunctive relief aimed at a preventing a repetition of the wrongful acts that the court has found to have already occurred. *See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435, 61 S. Ct. 693, 699 (1941) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past."); *Russian Media Grp., LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010); *Lineback v. Spurino Mat'ls, LLC*, 546 F.3d 491, 504 (7th Cir. 2008). Thus, we are not persuaded that the lack of express statutory authorization for forward-looking injunctive relief, *cf.* 15 U.S.C. §§ 77t(b), 78u(d)(1) (authorizing injunctions to restrain imminent violations of securities laws), deprived the district court of the power to enter such an injunction.

Nor has Spectrum persuaded us that the district court abused its discretion in deciding that injunctive relief is appropriate in this case. The burden of proof on this point of course belonged to the government, and the court did not improperly shift the burden to Spectrum, as the company suggests it did. R. 234 at 17 (recognizing that burden belonged to government as plaintiff); R. 234 at 21 ("the court finds that plaintiff has made an adequate showing of the need for permanent injunctive relief …"). The burden was not onerous: once the government "has demonstrated a past violation, it need only show that there is a reasonable likelihood of future violations in order to obtain injunctive relief." *SEC v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015) (quoting *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)). The district court did not clearly err in finding that the government met this burden. Spectrum describes its violations as an "isolated occurrence." Spectrum Reply Br. 22. That may be true in the sense that its violations of the CPSA involved a single defect in one line of coffeemakers. But it is not isolated in any other sense of the word. For three years *after* Spectrum itself concluded that the original handle on its SpaceMaker carafe was defective and ordered changes to the design, the company failed to report the defect to the CPSC, notwithstanding the many hundreds of complaints it continued to receive during that period and the knowledge that the handle failures resulted in consumer injuries with some regularity. And when it finally recalled the coffeemaker, Spectrum (inadvertently) continued to sell the product. The evidence produced at the remedies hearing showed—and the district court found—that Spectrum's violations of the statute were due to serious and systemic defalcations within the

company, among them: a failure of communication between staff who were familiar with the defects in the design of the original carafe handle and staff who handled customer complaints; a failure among senior managers to meaningfully confront the situation with the coffeemaker's carafe until 2012 despite knowing as early as April 2009 that there were problems with the product; the lack of systems to prevent the continued distribution of recalled products; and the failure to train staff on compliance with the CPSA.

Given the gravity of these failures and the company's delay in complying with its reporting obligation, the district court justifiably concluded that there was a reasonable likelihood that Spectrum might again commit similar violations of the statute in the future. To be sure, Spectrum by the time of the remedies hearing had undertaken significant efforts to address the weaknesses in its corporate culture that had resulted in its continued sales of the defective coffeemaker and its failure to timely report the hazard posed by the defect to the Commission. But, as the district court pointed out, Spectrum had not submitted to an independent audit to evaluate its compliance systems or processes and to solicit external advice as to what additional changes, if any, might be prudent. Nor, we would add, was there evidence before the court as to how effective the remedial measures undertaken by the company in the wake of the coffeemaker matter had thus far proven to be in practice. The court reasonably concluded that a permanent injunction requiring the company to take specified categories of proactive measures was a necessary and appropriate step aimed at reducing the likelihood that the company would, in the future, commit violations similar to those that had led the court to fine

the company. And, of course, pursuant to Fed. R. Civ. P. 60(b) and *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 112 S. Ct. 748 (1992), Spectrum retains the right to seek a modification and/or lifting of the injunction at a future date as any material change in the circumstances warrant.

Finally, the district court did not err in ordering the company to employ an independent auditor as one of these proactive measures. Spectrum's objections to this requirement fall into two categories: procedural and substantive.

Spectrum's first contention is that the district court lacked authority to amend the injunction to add the consultant requirement. In Spectrum's view, the requirement constituted not a mere clarification of the original injunction but a new, substantive requirement that represented a substantial change from the terms of the injunction as originally entered; and although the district court had the authority to modify the judgment, *see Rufo*, 502 U.S. 367, 112 S. Ct. 748; *Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1187 (7th Cir. 1994), the government itself never made a motion pursuant to Rule 60 asking the court to entertain such a modification.

Given the sequence of events that led to the final injunction as amended, however, the district court was within its rights to consider a modification of this nature. Recall that in its first iteration, the injunction ordered Spectrum to "maintain sufficient systems, programs, and internal controls to ensure compliance with the CPSA and the regulations enforced by the CPSC" and, within a period of six months, to "implement appropriate improvements to its compliance programs." R. 234 at 22. When Spectrum subsequently sought a partial stay of the

district court's judgment pending appeal, including most of the requirements imposed by the injunction, the company argued among other things that the injunction was impermissibly vague and overbroad. It was in response to that line of argument that the court, recognizing that its injunction may not have been as specific and concrete as it ought to have been, treated Spectrum's motion as one to clarify the obligations imposed by the injunction. R. 243 at 3–4. Following briefing as to the nature and sufficiency of the improvements Spectrum had already made to its compliance procedures and programs, the court endeavored to do just that. It modified the injunction to include six specific requirements tracking the improvements Spectrum averred were already in place; the court viewed these improvements as sufficient to resolve Spectrum's concerns about the vagueness of the injunction and to ensure preservation of the status quo pending appeal. 2018 WL 502736, at *2–*3. But the court agreed with the government that these improvements might not be sufficient, in and of themselves, to ensure compliance with the spirit of the court's injunction and to avoid a repetition of the events that led to the company's violation of the CPSA. For that reason, the court accepted the government's proposal that Spectrum also be required to engage an outside consultant to assess the efficacy of its compliance systems. *Id.* at *4. The court viewed the consultant as "a straightforward, specific way for Spectrum to ensure its good faith compliance with the permanent injunction, rather than continuing to live under the vagueness of the admonition to 'obey-the-law' currently contained in the permanent injunction." *Id.* Recognizing, however, that engag-

ing a consultant went beyond the status quo, the court stayed enforcement of that specific requirement pending appeal. *Id.*

To the extent the requirement to engage a consultant constituted a substantive modification, as opposed to a simple clarification, of the original injunction, it was well within the court's authority to make this modification in response to Spectrum's arguments that the injunction's vagueness made it impossible for the company to know how precisely to comply with the court's command. R. 237 at 6. True, Spectrum did not formally ask the court to modify the injunction and neither did the government separately make such a motion. But it was well within the court's power to look beyond the label to the substance of Spectrum's motion and to treat the request for a stay not only as one to clarify the injunction, but also as one to modify the injunction as necessary to address Spectrum's concerns—which is precisely how the court construed the motion. R. 243 at 3–4 & n.1. Our subsequent remand of the case to the district court eliminated any question as to whether the court had jurisdiction to make this change and the other amendments to the judgment. *See Doctors Nursing & Rehab. Ctr. v. Sebelius*, 613 F.3d 672, 677–78 (7th Cir. 2010); *Chicago Downs Ass'n v. Chase*, 944 F.2d 366, 370 (7th Cir. 1991); *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 849–50 (7th Cir. 1981).

Nor did the district court abuse its discretion in concluding that an outside consultant was warranted. As the parties agree, this provision is commonly included in consent decrees as a means of insuring that the problems that have given rise to litigation are, in fact, resolved. *See* R. 254 at 9 n.4 (collecting consent decrees in CPSA cases requiring employment of

outside experts); *NW Environ. Defense Ctr. v. H&H Welding,* 2015 WL 7820958, at *4 (D. Ore. Oct. 13, 2015); *F.T.C. v. Nat'l Urological Grp., Inc.,* 2006 WL 8431977, at *1 (N.D. Ga. Jan. 9, 2006); *E.E.O.C. v. Harvest Med. Clinic, Inc.,* 2005 WL 2484668, at *2 (D. Az. Sept. 14, 2005). Spectrum, of course, did not enter into a consent decree, but that by no means undermines the utility or propriety of requiring it to engage an outside expert. *See, e.g., United States v. Blue Ribbon Smoked Fish, Inc.,* 179 F. Supp. 2d 30, 50–51 (E.D.N.Y. 2001) (sustaining government's request that defendant be ordered either to pay for agency inspections or to hire outside consultant to monitor food safety), *j. aff'd in part, vacated in part on other grounds, & remanded,* 56 F. App'x 542 (2d Cir. 2003). The omissions that gave rise to Spectrum's liability in this case were significant and prolonged, and unnecessarily exposed a significant number of consumers to physical harm. There appears to be no dispute that wholesale reforms to Spectrum's regulatory compliance systems and culture were called for; the number of consumer products that Spectrum distributes only makes the need for those reforms more imperative. Although the company had endeavored to make the changes needed, those reforms, as we have said, had not been subjected to independent scrutiny. It was reasonable for the district judge to think that a second opinion as to the sufficiency of these reforms would be useful as an additional means of ensuring that Spectrum did not commit similar violations in the future. Moreover, Spectrum itself, in seeking a partial stay of the judgment, had expressed concern about its ability to comply with the spirit of the court's injunction. It complained of the "difficulties inherent in operating a large consumer business pursuant to a vague

injunction that does not specify what Spectrum must do in order to ensure that it is complying with the Court's order." R. 237 at 6. The advice of an independent consultant would no doubt help to address this very concern. We add, finally, that the district court included a procedure for judicial review of any proposals by the consultant that Spectrum found objectionable, which will serve as a check on the consultant's authority.

### III.

For all of the reasons we have discussed, the judgment of the district court is AFFIRMED.

MANION, *Circuit Judge*, concurring in part and concurring in the judgment. I write separately to note a narrow point of disagreement with the court's detailed opinion relating to the statute of limitations issue.[1] I agree Spectrum's[2] conduct amounts to a "continuing violation" that lasted into 2012, and therefore the government's complaint was timely. I disagree, however, concerning the nature of that continuing violation.

The court relies on *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999), and concludes a failure to report is a single continuing wrong that lasts until a report is filed[3] because the failure "perdures beyond the initial failure to make a timely report." Maj. Op. at 27. I, on the other hand, view the failure to report as a series of isolated acts that continue to occur each time when an entity fails to report within 24 hours of obtaining sufficient information to trigger the requirement. *See* 15 U.S.C. § 2064(b); 16 C.F.R. § 1115.14(e).

Nevertheless, given the facts in this case, my understanding does not change the outcome. Because Spectrum did not report to the Commission when its duty first arose in 2009, each new consumer complaint and subsequent failure to report amounted to a recurring series of violations of the

---

[1] I join in full the court's opinion as it concerns the appropriateness of the district court's injunction.

[2] Like the court, I treat Spectrum and its former subsidiary Applica Consumer Products, Inc., as one and the same company. *See* Maj. Op. at 2 n.1.

[3] The failure also ends if the requirement to file a report is obviated by the Commission "inform[ing] the subject firm" it is already "adequately informed." 16 C.F.R. § 1115.3(a).

reporting requirement.[4] Thus, Spectrum's persistent failure to file a report with the Commission as it continued to obtain information showing its product was dangerously defective was a "continuing violation" that continued into 2012,[5] and the government's 2015 complaint was timely.[6] *See Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001) ("The continuing violation doctrine allows a plaintiff to get relief for time-barred acts by linking them with acts within the limitations period."); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) (announcing the same rule); *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983) ("[T]he statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with … .").

*****

From January 2009 to April 2012, Spectrum received 1,620 customer complaints; a rate of more than one per day. Spectrum could have filed its report to the Commission much sooner than it did, and that date, at the latest, would be the

---

[4] The court acknowledges this as a possibility, but it does not consider it dispositive. *See* Maj. Op. at 29. I think it is dispositive.

[5] When Spectrum finally filed its report with the Commission in April 2012, it definitively prevented further violations of the reporting requirement. At that point, information may have triggered a duty to supplement the report already filed, *see* 16 C.F.R. § 1115.13(d), but there could no longer be violations of the initial duty to report because the Commission would have knowledge of the defect, *see* 15 U.S.C. 2064(b).

[6] I point out that in February 2014—within the limitations period as even Spectrum would have it—the government sent Spectrum a letter explaining its belief Spectrum had violated the reporting requirement and penalties were appropriate. Nevertheless, for some reason it delayed filing its complaint until June 2015.

start of the five-year limitations period. The government would then have five years to file a complaint, probably noting that customers continued to complain. If Spectrum and the government had proceeded accordingly, this case would not be here.

But as it is, Spectrum engaged in a series of violations of the reporting requirement that lasted into 2012. It cannot hide behind the untimeliness of its self-imposed delay in reporting a problem that developed months and years earlier. The government timely filed its complaint in 2015.